UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Blue Cross and Blue Shield of Minnesota, as Administrator of the Blue Cross and Blue Shield of Minnesota Pension Equity Plan; CentraCare Health System, on Behalf of Itself and the Sisters of the Order of Saint Benedict Retirement Plan; Supplemental Benefit Committee of the International Truck and Engine Corp. Retiree Supplemental Benefit Trust, as Administrator of the International Truck and Engine Corp. Retiree Supplemental Benefit Trust; Jerome Foundation; Meijer, Inc., as Administrator of the Meijer OMP Pension Plan and Meijer Hourly Pension Plan, Participants in the Meijer Master Pension Trust; Nebraska Methodist Health System, Inc., on Behalf of Itself, and as Administrator of the Nebraska Methodist Hospital Foundation, the Nebraska Methodist Health System Retirement Account Plan, and the Jennie Edmundson Memorial Hospital Employee Retirement Plan; North Memorial Health Care, on Behalf of Itself and as Administrator of the North Memorial Health Care Pension Plan; The Order of Saint Benedict, as the St. John's University Endowment and the St. John's Abbey Endowment; The Twin City Hospitals-Minnesota Nurses Association Pension Plan Pension Committee, as Administrator of the Twin City Hospitals-Minnesota Nurses Association Pension Plan; Administrative Committee of the Joint Hospitals Pension Board, as Administrator of the Twin City Hospitals Pension Plan for Licensed Practical Nurses; The Board of Trustees of the Tuckpointers Local 52 Pension Trust Fund, as Administrator of the Tuckpointers Local 52 Pension Trust Fund, and the Board of Trustees of the Chicago Area Joint Welfare Committee for the Pointing, Cleaning and Caulking Industry Local 52, as Administrator for the Chicago Area Joint Welfare Committee for the Pointing, Cleaning and Caulking Industry Local 52; The El Paso County Retirement Plan

Plaintiffs,

vs.

Wells Fargo Bank, N.A.,

Defendant.

Case No. 11-cv-2529
DWF/JJG

**THIRD AMENDED
COMPLAINT**

**JURY TRIAL
DEMANDED**

---

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

PARTIES .................................................................................................................... 3

    I.     PLAINTIFFS ............................................................................................. 3

          A.     Blue Cross and Blue Shield of Minnesota, as Administrator
                  of the Blue Cross and Blue Shield of Minnesota Pension
                  Equity Plan ........................................................................................ 3

          B.     CentraCare Health System, on Behalf of Itself and the Sisters of
                  the Order of Saint Benedict Retirement Plan ...................................... 4

          C.     Supplemental Benefit Committee of the International Truck
                  and Engine Corp. Retiree Supplemental Benefit Trust, as
                  Administrator of the International Truck and Engine Corp.
                  Retiree Supplemental Benefit Trust ..................................................... 5

          D.     Jerome Foundation .............................................................................. 5

          E.     Meijer, Inc., as Administrator of the Meijer OMP Pension
                  Plan and Meijer Hourly Pension Plan, Participants in
                  the Meijer Master Pension Trust .......................................................... 6

          F.     Nebraska Methodist Health System, Inc., on Behalf of Itself,
                  and as Administrator of the Nebraska Methodist Hospital
                  Foundation, The Nebraska Methodist Health System Retirement
                  Account Plan, and the Jennie Edmundson Memorial Hospital
                  Employee Retirement Plan ................................................................... 6

          G.     North Memorial Health Care, on Behalf of Itself and as
                  Administrator of the North Memorial Health Care Pension Plan ........ 7

          H.     The Order of Saint Benedict, as the St. John's University
                  Endowment and the St. John's Abbey Endowment ............................. 7

          I.     Twin City Hospitals – Minnesota Nurses Association Pension
                  Plan Pension Committee, as Administrator of the Twin City
                  Hospitals – Minnesota Nurses Association Pension Plan .................... 8

          J.     Administrative Committee of the Joint Hospitals Pension Board,
                  as Administrator of the Twin City Hospitals Pension Plan for

Licensed Practical Nurses ................................................................. 8

K.   The Board of Trustees of the Tuckpointers Local 52 Pension Trust
     Fund, as Administrator of the Tuckpointers Local 52 Pension
     Trust Fund, and the Board of Trustees of the Chicago Area Joint
     Welfare Committee for the Pointing, Cleaning and Caulking
     Industry Local 52, as Administrator for the Chicago Area Joint
     Welfare Committee for the Pointing, Cleaning and Caulking
     Industry Local 52 ............................................................................... 8

L.   The El Paso County Retirement Plan ................................................... 9

II.   DEFENDANT WELLS FARGO ................................................................... 9

JURISDICTION AND VENUE ........................................................................... 12

JURY TRIAL DEMAND ..................................................................................... 12

FACTS .................................................................................................................. 13

I.   THE WELLS FARGO SECURITIES LENDING PROGRAM.................... 13

A.   Securities Lending Was Offered as Conservative Option
     for Investors ......................................................................................... 13

B.   Wells Fargo Aggressively Marketed its Securities Lending
     Program ................................................................................................ 14

C.   Wells Fargo Represented that the Collateral Would be Safely
     Invested in High Grade Money Market Instruments .......................... 15

II.   THE LEGAL STRUCTURE OF THE WELLS FARGO SECURITIES
      LENDING PROGRAM .................................................................................. 17

A.   The Custody Agreements ..................................................................... 17

B.   The Wells Fargo Securities Lending Agreement ................................ 17

     1.   Wells Fargo Agreed to Act as Plaintiffs' Agent ..................... 17

     2.   Wells Fargo Pledged that the "Prime Considerations"
          for Investments Would be "Safety of Principal and
          Liquidity" ................................................................................. 18

     3.   Wells Fargo Shared the Earnings from Securities
          Lending Program ...................................................................... 18

4.      Plaintiffs Retained the Right to Terminate All Loans of
        Their Securities, "For Any Reason at Any Time" ................. 18

5.      Plaintiffs Retained the Right to Terminate Their
        Participation in the Securities Lending Program on
        60 Days Notice..................................................................... 19

6.      Plaintiffs Retained the Right to Manage Their
        Investments, Including the Right to Sell the Loaned
        Securities at Any Time............................................................ 19

7.      Wells Fargo Assumed the Risk of Loss Due to its
        Negligence or Fraud............................................................. 20

C.      The Wells Fargo Trust for Securities Lending ................................. 20

1.      Wells Fargo Created a Business Trust for Securities
        Lending and Named Itself the Sole Trustee.......................... 20

2.      The Business Trust and Wells Fargo as Trustee Failed to
        Comply With Either Maryland or Minnesota Law ................ 21

D.      Wells Fargo Created "Series," or Separate Funds, Within the
        Business Trust....................................................................... 21

1.      The Subscription Agreement ................................................. 22

2.      The Confidential Memoranda ................................................ 22

        a.      Wells Fargo Again Agreed to Protect the Safety
                and Liquidity of the Collateral Investments.............. 22

        b.      Wells Fargo Agreed to Value Plaintiffs' Interests
                in the Funds at Current Market Value....................... 23

        c.      Wells Fargo Agreed to Redeem Plaintiffs' Interests
                in Cash ................................................................... 23

        d.      Wells Fargo Again Agreed to be Liable for its
                Wrongful Conduct .................................................... 23

3.      The Investment Policies for the Funds.................................. 24

III.    WELLS FARGO'S MULTIPLE BREACHES OF FIDUCIARY DUTY, FRAUDULENT CONDUCT, AND BREACHES OF CONTRACT .......... 25

    A.    Wells Fargo Failed to Manage the SLP Similar to a Rule 2a-7 Money Market Fund as it Promised.................................................. 26

    B.    Wells Fargo Invested in Risky Investments Contrary to its Obligations....................................................................................... 26

        1.    Wells Fargo's Chairman and CEO Repeatedly Stated that the Bank Knew to Avoid Risky Investments.................. 27

        2.    The SLP Heavily Invested in SIVs, Despite Wells Fargo's Knowledge of Their "Enormous Risks".................. 28

        3.    The SLP Had Significant Exposure to Lehman Brothers, Despite Wells Fargo's Knowledge of its Impending Implosion .............................................................................. 30

        4.    The SLP Was Over-Exposed to Real Estate and Subprime Investments, Despite Wells Fargo's Knowledge that These Investments Were "Toxic" ......................................... 31

        5.    Wells Capital's Analysis of the SLP Confirmed the Inappropriateness of the SLP Collateral Investments............ 32

    C.    Wells Fargo Violated the Liquidity Guidelines ................................. 33

    D.    Wells Fargo Failed to Take Appropriate Action as the Credit Crisis Unfolded ................................................................................. 33

        1.    The Removal of Securities from the Approved List.............. 34

        2.    The NAV "Breaks the Buck"................................................. 35

    E.    "Hostage Clients" and the "Blowing Up" of the Trust ...................... 35

    F.    Wells Fargo Breached its Fiduciary Duty of Impartiality by Giving "Different Deals" to Clients Who Were "More Important" to the Bank....................................................................... 36

    G.    Wells Fargo Breached its Fiduciary Duties by Asserting Rights and Claims on Behalf of the Borrowing Brokers to the Detriment of Plaintiffs ................................................................. 38

    H.    Wells Fargo Breached its Duty of Full Disclosure ........................... 38

I.      Wells Fargo Breached its Duties to Plaintiffs By
        Creating the Business Trust in an Attempt to "Extinguish"
        Plaintiffs' Rights ............................................................................... 40

J.      Wells Fargo Breached Plaintiffs' Contracts by Refusing to
        Return Their Securities and/or Redeem Their Interests in the
        Securities Lending Program ............................................................. 41

K.      Fraudulent Concealment ................................................................... 41

IV.   FACTS SPECIFIC TO EACH PLAINTIFF ................................................. 42

A.      Introduction ...................................................................................... 42

B.      BCBSMN Pension Plan ................................................................... 45

C.      CentraCare and the Sisters Retirement Plan .................................... 46

D.      International Truck Retiree Trust ...................................................... 47

E.      Jerome ............................................................................................... 48

F.      Meijer Pension Trust ........................................................................ 49

G.      Nebraska Methodist .......................................................................... 50

H.      North Memorial ................................................................................ 51

I.      St. John's .......................................................................................... 52

J.      Nurses Pension Plan ......................................................................... 52

K       LPN Plan ........................................................................................... 53

L.      Tuckpointers Local 52 ...................................................................... 54

M.      El Paso County Retirement Plan ...................................................... 54

CAUSES OF ACTION ..................................................................................... 55

    COUNT I(a) – Breach of Fiduciary Duty – Non-ERISA
    (On Behalf of CentraCare, Sisters Retirement Plan, Jerome,
    Nebraska Methodist, North Memorial, St. John's, and El Paso
    Retirement ("Non-ERISA Plaintiffs")) ....................................................... 55

    COUNT I(b) – Breach of Fiduciary Duty – ERISA
    (On Behalf of BCBSMN Pension Plan, International
    Truck Retiree Trust, Meijer Pension Trust, Nurses Pension Plan, Nebraska
    Methodist, Tuckpointers Local 52, and LPN Plan
    ("ERISA Plaintiffs")) ................................................................................. 59

    COUNT II – Breach of Contract
    (On Behalf of the Non-ERISA Plaintiffs) ................................................. 63

    COUNT III – Intentional and Reckless Fraud and Fraudulent
    Nondisclosure/Concealment
    (On Behalf of the Non-ERISA Plaintiffs) ................................................. 65

    COUNT IV – Negligent Misrepresentation
    (On Behalf of the Non-ERISA Plaintiffs) ................................................. 70

    COUNT V – Violation of Minnesota Prevention of Consumer Fraud
    Act—Minn. Stat. §§ 325F.69 and 8.31
    (On Behalf of the Non-ERISA Plaintiffs) ................................................. 71

    COUNT VI – Unlawful Trade Practices—Minn. Stat. §§ 325D.13 and 8.31
    (On Behalf of the Non-ERISA Plaintiffs) ................................................. 74

    COUNT VII – Deceptive Trade Practices—Minn. Stat. §§ 325D.44 and 8.31
    (On Behalf of the Non-ERISA Plaintiffs) ................................................. 75

TOLLING OF STATUTES OF LIMITATIONS (On Behalf of All Plaintiffs) .................... 76

PRAYER FOR RELIEF ................................................................................. 77

The above-named Plaintiffs, for their causes of action against Wells Fargo Bank, N.A. ("Wells Fargo"), allege and state as follows:

## INTRODUCTION

1.      This action arises out of systematic, intentional, and unlawful conduct—including breaches of fiduciary duty, breaches of contract, and fraud—in a multi-billion dollar securities lending program run by one of the nation's largest banks.

2.      Each Plaintiff herein is, or was during the relevant time period, a participant in the Wells Fargo securities lending program ("SLP"), and each has suffered substantial damages caused by Wells Fargo's unlawful conduct.

3.      This unlawful conduct by Wells Fargo includes a pattern of improper investments in risky securities; failure to properly monitor and manage those investments; failure to disclose material information about the status of the program and its investments to participants, including intentional fraudulent concealment of such information; failure to treat all participants equally and impartially; and failure to put the interest of the participants ahead of the interests of the bank.

4.      Wells Fargo marketed its SLP to institutional clients, including Plaintiffs, as a way to earn marginally higher returns on securities they already owned.  Wells Fargo held its clients' securities in custodial accounts and, as the clients' agent and fiduciary—which imposed upon Wells Fargo the duty to act in the utmost of good faith—made temporary loans of the clients' securities to brokers.  The clients, including Plaintiffs herein, had the right to recall their loaned securities at any time, for any reason.

5.      To secure the transactions, the brokers borrowing the securities posted collateral—primarily cash.  Wells Fargo promised to invest the cash in conservative investments,

which Wells Fargo repeatedly represented would be "high-grade money market instruments," where the "prime considerations" would be "safety of principal and liquidity."  Wells Fargo analogized the SLP collateral investments (which were pooled in Funds) to SEC Rule 2a-7 money market funds, generally viewed as one of the most conservative investments.  (Only one Rule 2a-7 money market fund lost money for its clients even in the recent financial crisis.)   In line with the (promised) conservative nature of the collateral investments, the SLP returns were expected to be small, for example, yielding incremental profits to offset Wells Fargo's custodial fees.

6.      Despite Wells Fargo's repeated promises, however, Wells Fargo heavily invested the SLP collateral in risky and/or highly illiquid securities, including Structured Investment Vehicles ("SIVs") and mortgage-backed assets with maturity dates that reached out nearly 40 years.

7.      In public statements, Wells Fargo's CEO and Chairman boasted that Wells Fargo avoided these types of investments—including SIVs—when investing the bank's own money. Wells Fargo CEO John Stumpf, in fact, characterized SIVs as "taking enormous risks" and joked that he thought an SIV "was some new automobile."  Yet Wells Fargo risked its clients' money in these same investments in the SLP—a program that the bank marketed and misrepresented as conservative and safe.

8.      Wells Fargo then covered up its wrongful actions, as well as its knowledge of the deteriorating condition of the SLP collateral investments.

9.      Like a Rule 2a-7 money market fund, the SLP collateral pools were supposed to have a Net Asset Value ("NAV") that stayed constant.  But by the spring of 2007, one of the collateral pools "broke the buck," with its NAV falling below par.  This is considered a

catastrophic event that should be immediately disclosed.  Wells Fargo, however, concealed this from its SLP clients, including Plaintiffs, for month after month, until its November 2007 newsletter.

10.     Even after November 2007, Wells Fargo continued to conceal the most damning information on the status of the SLP and the collateral investments.  After November 2007, Wells Fargo also—by its own admission—held many of its SLP clients "hostage," refusing to return their loaned securities unless the clients consented to unlawful conditions.

## PARTIES

### I.     PLAINTIFFS

#### A.     Blue Cross and Blue Shield of Minnesota, as Administrator of the Blue Cross and Blue Shield of Minnesota Pension Equity Plan

11.     Blue Cross and Blue Shield of Minnesota is a not-for-profit corporation that was chartered in 1933 as Minnesota's first health plan.  It seeks to promote a wider, more economical, and timely availability of health services for the people of Minnesota.  Blue Cross and Blue Shield of Minnesota employs approximately 3,700 people, and contributes $250 million in salary and wages annually.  It is Administrator of the Blue Cross and Blue Shield of Minnesota Pension Equity Plan ("BCBSMN Pension Plan"), which is a pension plan for Blue Cross and Blue Shield of Minnesota employees governed by the Employees Retirement Income Security Act (ERISA), 29 U.S.C § 1001 *et seq*.  BCBSMN Pension Plan began participation in the Wells Fargo SLP in April 2006 and exited the program in March 2008.  It has its principal place of business in Eagan, Minnesota.

**B.      CentraCare Health System, on Behalf of Itself and the Sisters of the Order of Saint Benedict Retirement Plan**

12.      CentraCare Health System ("CentraCare") is a collaborative group of central Minnesota healthcare professionals working together to provide comprehensive, high-quality care, close to home.  It began more than 125 years ago when the Sisters of the Order of Saint Benedict built the first hospital in St. Cloud.  Now, it is an integrated multi-organizational healthcare system and a Minnesota non-profit corporation.  CentraCare is the parent corporation of CentraCare Clinic, Saint Cloud Hospital, CentraCare Health System—Melrose, CentraCare Health System—Long Prairie, and CentraCare Health Foundation.  CentraCare also operates four long-term care facilities and provides numerous specialty care services.  CentraCare services over a half million central Minnesota people per year.  CentraCare's principal place of business is in St. Cloud, Minnesota.  The securities it had in securities lending were investments of CentraCare, including of its hospitals, nursing homes, Foundation and other affiliated providers.

13.      The Sisters of the Order of Saint Benedict was founded in 1857 and established St. Cloud's first hospital in 1886, the predecessor to the Saint Cloud Hospital.  Its retirement plan ("Sisters Retirement Plan") currently provides benefits for retired employees of the Sisters and St. Cloud Hospital.  The Plan was established on June 1, 1959, as a defined Benefit Pension Plan, and CentraCare oversees the Plan's investments.  The Sisters Retirement Plan has been qualified as a church plan.  Its principal place of business is St. Cloud, Minnesota.

14.      CentraCare and the Sisters Retirement Plan entered the SLP on March 9, 2007, and terminated their lending of securities in August 2009.  However, SLP collateral that could not be sold continues to be held in an escrow account.

**C.** **Supplemental Benefit Committee of the International Truck and Engine Corp. Retiree Supplemental Benefit Trust, as Administrator of the International Truck and Engine Corp. Retiree Supplemental Benefit Trust**

15.     The Supplemental Benefit Committee of the International Truck and Engine Corp. Retiree Supplemental Benefit Trust is the Administrator of the International Truck and Engine Corporation Retiree Supplemental Benefit Trust ("International Truck Retiree Trust"), which is a Voluntary Employees' Beneficiary Association (for non-government employees) governed by ERISA for the employees of International Truck and Engine Corporation, now Navistar, Inc.  International Truck Retiree Trust has its principal place of business in Richmond Heights, Ohio.  It entered the SLP in 2003, and terminated its lending of securities in 2011. However, collateral that could not be sold continues to be held in an escrow account.

**D.** **Jerome Foundation**

16.     The Jerome Foundation ("Jerome"), created by artist and philanthropist Jerome Hill, supports the creation, development, and production of new works by emerging artists. Jerome makes grants to not-for-profit arts organizations and artists in Minnesota and New York City.  Its most recent round of grants, in February 2011, totaled $664,000 to 23 separate arts initiatives.  Jerome is a charitable foundation registered with the Office of the Attorney General of Minnesota in St. Paul, Minnesota, pursuant to Minn. Stat. § 501B.33 *et seq*.  Its principal place of business is in St. Paul, Minnesota.  It entered the SLP in March 2004 and terminated its lending of securities in March 2010.  Wells Fargo continues to hold the SLP collateral for Jerome in an escrow account.

**E.     Meijer, Inc., as Administrator of the Meijer OMP Pension Plan and Meijer Hourly Pension Plan, Participants in the Meijer Master Pension Trust**

17.     Meijer, Inc., is a "supercenter" retailer with over 190 stores in Michigan, Ohio, Indiana, Illinois, and Kentucky.  Meijer, Inc., is a family-owned, privately held corporation that employs over 60,000 people.  It is incorporated in the state of Michigan, and its principal place of business is in Grand Rapids, Michigan.  Meijer, Inc., is Administrator of the Meijer OMP Pension Plan and Meijer Hourly Pension Plan, which are participants in the Meijer Master Pension Trust ("Meijer Pension Trust") and are pension plans governed by ERISA for employees of Meijer, Inc.  The Meijer Pension Trust entered the SLP in July 2006, and remains in the program.

**F.     Nebraska Methodist Health System, Inc., on Behalf of Itself, and as Administrator of the Nebraska Methodist Hospital Foundation, the Nebraska Methodist Health System Retirement Account Plan, and the Jennie Edmundson Memorial Hospital Employee Retirement Plan**

18.     Nebraska Methodist Health System, Inc., consists of a 430-bed hospital in Omaha, Nebraska, a 236-bed hospital in Council Bluffs, Iowa, and a newly-constructed 116-bed Women's Hospital in West Omaha, Nebraska.  It is incorporated in the state of Nebraska, and its principal place of business is in Omaha, Nebraska.  Nebraska Methodist Health System, Inc., participated in the SLP, as itself and as an Administrator, as two separate participants: The Nebraska Methodist Hospital Foundation and the Nebraska Methodist Health System, which consisted of securities held by Nebraska Methodist Health System as well as securities held by the Nebraska Methodist Health Systems Defined Benefit Plan—a benefits plan governed by ERISA and consisting of the Nebraska Methodist Health System Retirement Account Plan and the Jennie Edmundson Memorial Hospital Employee Retirement Plan.  They are collectively

referred to herein as "Nebraska Methodist."  They entered the SLP in August 1999, and remain in the program.

### G.    North Memorial Health Care, on Behalf of Itself and as Administrator of the North Memorial Health Care Pension Plan

19.    North Memorial Health Care ("North Memorial") has served the Twin Cities area for over 50 years, currently operating North Memorial Medical Center, a Level 1 trauma center and certified primary stroke center that is the only major independent health care provider in the Twin Cities.  It also operates eight primary care clinics and a state-of-the-art Outpatient Center that includes cancer, radiology, and educational services.  North Memorial's principal place of business is in Robbinsdale, Minnesota.  North Memorial participates in the SLP both on behalf of itself and as administrator of the North Memorial Health Care Pension Plan, under a single Securities Lending Agreement.  The North Memorial Health Care Pension Plan is a plan governed by ERISA.  It entered the SLP in September 1996, and  remains in the program.

### H.    The Order of Saint Benedict, as the St. John's University Endowment and the St. John's Abbey Endowment

20.    The Order of Saint Benedict is a Roman Catholic religious order.  (It is a separate and distinct entity from another Plaintiff, the Sisters of the Order of Saint Benedict Retirement Plan.)  In Minnesota, it runs St. John's University, St. John's Abbey, St. John's Preparatory School, and the Liturgical Press.  Its principal place of business is in Collegeville, Minnesota.  It participated in the SLP as "St. John's – The Order of Saint Benedict" for the purpose of lending securities held by the St. John's University Endowment and the St. John's Abbey Endowment. St. John's – The Order of Saint Benedict ("St. John's") entered the SLP in April 2005, and remains in the program.

I.      **Twin City Hospitals - Minnesota Nurses Association Pension Plan Pension Committee, as Administrator of the Twin City Hospitals - Minnesota Nurses Association Pension Plan**

21.     The Pension Committee is Administrator for The Twin City Hospitals - Minnesota Nurses Association Pension Plan ("Nurses Pension Plan"), a pension fund whose members are nurses at several hospitals in the Minneapolis/St. Paul metropolitan area in Minnesota.   It is a multi-employer ERISA plan.   Its principal place of business is in Bloomington, Minnesota.  It entered the SLP in August 2004, and remains in the program.

J.      **Administrative Committee of the Joint Hospitals Pension Board, as Administrator of the Twin City Hospitals Pension Plan for Licensed Practical Nurses**

22.     The Administrative Committee is Administrator for the Twin City Nurses Pension Plan for Licensed Practical Nurses ("LPN Plan"), a pension fund whose members are Licensed Practical Nurses at various hospitals in the Minneapolis/St. Paul metropolitan area in Minnesota. It is a multi-employer ERISA plan.  Its principal place of business is in Bloomington, Minnesota. It entered into the SLP in 2004, and terminated its lending of securities in October 2010.  Wells Fargo continues to hold the SLP collateral for the LPN Plan in an escrow account.

K.      **The Board of Trustees of the Tuckpointers Local 52 Pension Trust Fund, as Administrator of the Tuckpointers Local 52 Pension Trust Fund, and the Board of Trustees of the Chicago Area Joint Welfare Committee for the Pointing, Cleaning and Caulking Industry Local 52, as Administrator for the Chicago Area Joint Welfare Committee for the Pointing, Cleaning and Caulking Industry Local 52**

23.     These Boards of Trustees are Administrators for the Tuckpointers Local 52 Pension Trust Fund and the Chicago Area Joint Welfare Committee for the Pointing, Cleaning and Caulking Industry Local 52 ("Tuckpointers Local 52").  They are multi-employer ERISA plans.  Their principal place of business is in Elmhurst, Illinois.  Tuckpointers Local 52 entered into the SLP in 2007, and remains in the program.

L.      **The EL Paso County Retirement Plan**

24.      The El Paso County Retirement Plan ("El Paso Retirement"), is a 401(a) Defined Benefit Plan providing retirement benefits to over 3700 members, consisting primarily of active employees and retirees of El Paso County, Colorado; El Paso County Public Health; Office of the 4th Judicial District Attorney (Colorado); Pikes Peak Library District; and the El Paso County Retirement Plan.  El Paso Retirement pays out almost $17 million in annual benefits to retirees and beneficiaries, and seeks to provide members and beneficiaries with a dependable source of retirement income.  El Paso Retirement entered the SLP in January 1999 and terminated its lending of securities in early 2010.  Wells Fargo continues to hold SLP collateral for El Paso Retirement in an escrow account.

II.      **DEFENDANT WELLS FARGO**

25.      Defendant Wells Fargo Bank, N.A.'s articles of association designate Sioux Falls, South Dakota, as the location of its main office and its principal place of business.  It is therefore a citizen of South Dakota.  Wells Fargo has branches and offices in the Twin Cities and throughout Minnesota, and until recently operated its SLP out of offices in Minneapolis.  It is a wholly owned subsidiary of Wells Fargo & Company, a Delaware Corporation, whose principal place of business is in San Francisco, California.

26.      Each Plaintiff herein entered into a Securities Lending Agreement with either Norwest Bank Minnesota, Wells Fargo Bank Minnesota, N.A., or Wells Fargo Bank, N.A.  On information and belief, Norwest Bank Minnesota and Wells Fargo Bank Minnesota, N.A., were predecessors-in-interest to Defendant Wells Fargo, and Wells Fargo has succeeded to all of their relevant rights and assumed all of their relevant liabilities.  As used herein, "Wells Fargo" includes references to its predecessors-in-interest.

27.     Wells Fargo has acted in a variety of capacities with respect to the SLP, including, but not limited to, being the custodial bank for Plaintiffs' securities portfolios, being Plaintiffs' agent and fiduciary in the SLP, being Trustee of the Wells Fargo Trust for Securities Lending ("Business Trust"), and being "investment manager" for the collateral investments described herein.  Wells Fargo, in communicating with Plaintiffs regarding the SLP, did not generally distinguish among these various capacities.

28.     Various committees and departments of Wells Fargo (or its parent company, Wells Fargo & Company) have or had an ongoing institutional role in the SLP, including, but not limited to, the Wells Fargo Management Committee (which served as the Risk Committee); the Compliance Risk Management Group; the Wells Fargo Institutional Risk Committee (which determined the credit worthiness of potential securities borrowers); the Securities Lending Risk Management Executive Committee (which involved members of the management of the Securities Lending and Institutional Trust units of Wells Fargo, as well as representation from the operations, compliance, audit, and legal departments); the Securities Lending Portfolio Management Committee (which addressed portfolio management and policies); Wells Capital Management and its Short-Term Liquidity Committee (which rate, review, and approve short-term investments); and the Wells Fargo audit committee, board of directors, and law department.

29.     In addition, in its role as investment manager, Wells Fargo has stated that it may use the services of a number of subsidiaries or business units of Wells Fargo (or its parent company), including, but not limited to, Galliard Capital Management, Wells Capital Management ("Wells Capital"), and Peregrine Capital Management.

30.     In December 2008, Wells Fargo merged with Wachovia Corporation, with Wachovia becoming a division of Wells Fargo.  In October 2009, Wells Fargo transferred its

securities lending services—and securities lending customers, including Plaintiffs who were still in the SLP—to Wachovia Global Securities Lending, a division of Wachovia Bank, N.A. Subsequently, Wachovia Global Securities Lending was "rebranded" as ClearLend Securities, a division of Wells Fargo Bank, N.A.  According to a press release issued by Wachovia Global Securities Lending, "The newly-named business is a combination of the operations of Wells Fargo Securities Lending and Wachovia Global Securities Lending."  To the extent that allegations of this Complaint constitute ongoing breaches and violations of Plaintiffs' rights and fraudulent concealment after October 2009, it is alleged that those breaches, violations, and concealments were perpetrated, in whole or in part, by Wachovia Global Securities Lending and/or ClearLend Securities as successor, or partial successor, to Wells Fargo Securities Lending, in conjunction with Wells Fargo Bank, N.A.

31.    In April 2011, ClearLend Securities announced to its customers, including Plaintiffs, that "Wells Fargo Bank, N.A., had entered into a definitive agreement with [CitiCorp's] Global Transaction Services group in which Wells Fargo will be transitioning to Citi the clients of ClearLend Securities, Wells Fargo's agency securities lending business." Certain Plaintiffs have been notified that the transition will be effective November 18, 2011. These Plaintiffs have been asked to notify Wells Fargo by October 21, 2011, whether they will transfer their securities lending relationship to Citi and sign new securities lending agreements with Citi Global Transaction Services.  All ramifications of Wells Fargo's transfer of securities lending to Citi are not yet known, but Wells Fargo's actions with respect thereto may constitute a further breach of Wells Fargo's duties to Plaintiffs.

32.    As used herein, "Wells Fargo" includes all Wells Fargo officers, employees, and agents, including those of Wachovia, Wachovia Global Securities Lending, and ClearLend

Securities, and those of Wells Fargo's predecessors-in-interest, including Norwest Bank Minnesota, N.A., and Wells Fargo Bank Minnesota, N.A.

## JURISDICTION AND VENUE

33.     Subject matter jurisdiction is proper in this Court under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000 for each Plaintiff, and Plaintiffs and Defendant are citizens of different states.   Jurisdiction is also proper in this Court under 29 U.S.C. § 1132(e)(1) to the extent that Plaintiffs seek relief under ERISA § 404(a), 29 U.S.C § 1104(a).

34.     Personal jurisdiction in this Court is proper because (i) Defendant regularly and generally conducts business in the state of Minnesota; (ii) the contracts at issue in this litigation were entered into in the state of Minnesota and are governed by the laws of the state of Minnesota or, in the case of the ERISA plaintiffs, federal law; and (iii) the wrongful conduct committed by Defendant occurred in substantial part in the state of Minnesota.

35.     Venue is proper in the District of Minnesota under 28 U.S.C. § 1391(a)(2) because a substantial part of the events and omissions upon which this action is based occurred in this District.   Venue is also proper in this Court under ERISA § 404(a), 29 U.S.C § 1132(e)(2).

## JURY TRIAL DEMAND

36.     Plaintiffs demand a jury trial on all counts so triable.

## FACTS

**I.      THE WELLS FARGO SECURITIES LENDING PROGRAM**

**A.      Securities Lending Was Offered as Conservative Option for Investors**

37.      For decades, banks and other financial institutions offered securities lending programs to provide their institutional clients with a nominally extra return for agreeing to temporarily lend their securities to brokers.

38.      Securities lending programs were generally described as adhering to extremely conservative risk-management programs.  As a result, many institutional investors—including corporations, pension funds, public funds and entities, insurance companies, mutual funds, and foundations and endowments—participated in securities lending programs for many years.

39.      There were two main categories of investments involved in securities lending:

        a.      Investors' securities:  The first type of investment was the investors' own securities portfolios.  The bank (or other financial institution) that sponsored securities lending kept its investor-clients' portfolios in custodial accounts and loaned these securities to brokers, who needed temporary use of the securities to support their trading activities.

        b.      Collateral investments:  The second type of investment was made with the collateral that the bank (or other financial institution) received from the brokers who borrowed the securities.  To protect the investors in case the brokers defaulted and did not return the securities, the bank received collateral, generally cash, from the brokers. To underscore the conservative nature of securities lending, the brokers typically provided cash collateral that was worth more than the securities they borrowed (in Wells Fargo's case, 102% to 105% of the value). The bank then invested

this collateral until the securities were returned (and the bank returned the cash collateral to the brokers).   Because the loan of securities was temporary, and because the bank wanted to sell the collateral to re-pay the brokers in cash when the securities were returned, the collateral investments had to be safe and liquid.

40.      Wells Fargo began its SLP in 1982.   By approximately 2006, the Wells Fargo program reached $23 billion in loaned securities.

**B.      Wells Fargo Aggressively Marketed Its Securities Lending Program**

41.      The extraordinary growth of Wells Fargo's securities lending was due, in part, to Wells Fargo's aggressive marketing of the program.

42.      Wells Fargo called itself "One of America's Great Companies" and represented that it had more than a 150-year reputation "for accuracy, dependability, integrity and honesty."

43.      A series of Wells Fargo standardized marketing materials made more specific representations about the SLP, many of them repeated year after year:

a.      Securities lending allowed investors to "[i]ncrease earnings without interrupting . . . [i]nvestment strategy."   In other words, investors could reclaim their loaned securities at any time.

b.      "Consistently profitable."

c.      "'Every day funds are not doing it, they are throwing money away.'"

d.      The majority of mutual fund families participate in securities lending programs.  "More than four out of five [fund] families lend."

44.      On its website, Wells Fargo represented that:

a.      The Wells Fargo SLP was "one of the most stable and successfully internally managed securities lending programs in the industry."

   b. The Wells Fargo SLP "can maximize the earning potential of a client's portfolio while mitigating risks."

   c. The "historical performance" of the Wells Fargo SLP reflected "our expertise in collateral management."

   d. Wells Fargo's securities lending clients were "earning greater revenue and consistently achieving or exceeding revenue estimates."

 45. Despite these representations, far from "consistently achieving or exceeding revenue estimates," most recent participants in the Wells Fargo's SLP have lost substantial sums of money due to Wells Fargo's failure to mitigate risks.

  **C. Wells Fargo Represented that the Collateral Would be Safely Invested in High Grade Money Market Instruments**

 46. Wells Fargo repeatedly emphasized that it would safely invest the cash received as collateral for the loaned securities.  Wells Fargo repeated, year after year, the mantra of "high grade money market instruments."   For example, Wells Fargo standardized marketing reports repeatedly stated:

> Investment of cash collateral is made in high grade money market instruments such as: Commercial paper, Tri-Party Repurchase Agreements, Bank Time Deposits and CDs, and Money Market Funds.  Investing is done in pools to achieve the highest possible yield given client investment guidelines, while preserving principal and liquidity.

 47. Money market instruments are short term, highly liquid, easily converted to cash, and virtually risk free.

 48. Wells Fargo also analogized the pooled SLP collateral investments to SEC Rule 2a-7 money market funds.

49.     Money market funds have been viewed as so safe that typical descriptors include: "safe financial harbor," "safe haven," "one of the safest places to put cash," and "almost as safe as bank accounts."

50.     Wells Fargo offered additional standardized reassurances—beyond its pledge to invest in money market instruments—regarding the safety of the collateral investments.   For example, Wells Fargo stated:

    a.    "[S]afety of principal is our paramount goal."

    b.    "We are understandably proud of our commitment to safety and soundness in our securities lending program."

    c.    "NO NEED TO STRETCH FOR YIELD."

    d.    "[M]inimal risk."

    e.    "Only purchase fixed income or cash market securities that meet quality standards."

    f.    "Your investment guidelines are constantly monitored . . . and reviewed daily by our portfolio management and compliance team."

    g.    "Safeguards" against "Investment Risks" include:  "[o]nly approved top tier investments"; "[c]redit analyst develops pre-approved list"; "[a]sset/liability management for your protection"; "[p]rofessional portfolio management"; "Credit and Investment Committees monitor investments"; "[k]eep % of portfolio on demand"; and "[w]eighted average maturity of portfolio is tracked."

51.     Wells Fargo repeated many of these reassurances, verbatim, year after year.

II.     **THE LEGAL STRUCTURE OF THE WELLS FARGO SECURITIES LENDING PROGRAM**

52.     Wells Fargo drafted a series of legal documents to govern its SLP, including a Securities Lending Agreement, a Declaration of Trust, and various documents relating to three Series (or Funds) that Wells Fargo established as investment vehicles for the securities lending collateral.

A.     **The Custody Agreements**

53.     Each Plaintiff entered into a Custody Agreement with Wells Fargo, under which Wells Fargo agreed to provide custodial services for certain assets and securities owned by Plaintiffs (each referred to in the agreements as the "Owner").  The custody agreements made clear that the Plaintiffs retained the authority to direct their own accounts, providing, *inter alia,* that Wells Fargo would "[d]eliver cash or securities in such manner as the Owner may direct in writing."

B.     **The Wells Fargo Securities Lending Agreement**

54.     Wells Fargo required participants in its SLP to sign a Securities Lending Agreement, sometimes also called an Indemnified Securities Lending Agreement (the "Agreement").  Each Plaintiff herein executed an Agreement with Wells Fargo (or one of Wells Fargo's predecessors).

55.     The material terms of the Agreement were, in relevant part, virtually the same for each Plaintiff herein (identified as a "Participant" in the Agreement).

1.     **Wells Fargo Agreed to Act as Plaintiffs' Agent**

56.     In the Agreement, Wells Fargo accepted the fiduciary responsibility to act as the Plaintiffs' agent for purposes of securities lending.

### 2. Wells Fargo Pledged that the "Prime Considerations" for Investments Would be "Safety of Principal and Liquidity"

57. The Agreement provided restrictions on Wells Fargo's investment of the cash collateral.

58. First and foremost, the Agreement stated: "The prime considerations for the investment portfolio shall be safety of principal and liquidity requirements."

59. The Agreement further restricted Wells Fargo's investment of the cash collateral to certain types of investments, including (depending on the version of the Agreement) combinations of the following: U.S. treasuries and agencies, U.S. or Euro dollar certificates of deposit and time deposits, bankers acceptances, commercial paper, short-term investment funds, repurchase agreements, and master notes. These specific investments were further "subject to policy and standard guidelines established . . . by the Bank." This included, of course, the "prime considerations" of "safety of principal and liquidity." Indeed, most versions of the Agreement further defined these investments as "short term money market instruments."

60. The Agreement provided that all collateral investments would be "pooled for investment purposes" and "commingled."

### 3. Wells Fargo Shared the Earnings from Securities Lending Program

61. The Agreement specified that the earnings from securities lending—including the return on the investment of the cash collateral—would be shared by Wells Fargo and each Participant. The earnings split for the Plaintiffs herein ranged from 60% to 70% for the Participant, and 40% to 30% for Wells Fargo.

### 4. Plaintiffs Retained the Right to Terminate All Loans of Their Securities, "For Any Reason at Any Time"

62. Section 4 of the Agreement stated that each Plaintiff retained the right "to terminate any loan of securities for any reason at any time," unless otherwise agreed to.

CASE 0:11-cv-02529-DWF-KMM   Document 200   Filed 09/11/12   Page 26 of 85

63.     To ensure that this termination right was not impeded, Section 4 stated that Wells Fargo would enter Borrower Securities Loan Agreements with the brokers borrowing securities to provide for the return of corporate securities not later than three business days following a termination notice and, in the case of government securities, not later than the next business day.

64.     Section 4 also stated that the "Bank will have a reasonable time after receiving Participant's request to terminate any loan to liquidate cash collateral investments prior to terminating the loan."

65.     The Agreement did not define "reasonable time."  However, the Agreement, as well as the other Wells Fargo securities lending documents, stressed liquidity as a central requirement of the program, and called for the return of securities from the brokers within days. Also, as is clear in Section 4, the responsibility for liquidating the cash collateral was on the "Bank," not the securities lending participants.

> **5.     Plaintiffs Retained the Right to Terminate Their Participation in the Securities Lending Program on 60 Days Notice**

66.     The Agreement provided further rights for terminating participation in the program.  The Agreement stated:  "This Agreement may be terminated at any time by either Participant or the Bank upon 60 days written notice to the other."  The Agreement further stated that upon delivery of notice, "the Bank will terminate loans from Participant's Account in accordance with Borrower Security Loan Agreements."  As noted above, the Borrower Security Loan Agreements provided for the return of securities within one to five days.

> **6.     Plaintiffs Retained the Right to Manage Their Investments, Including the Right to Sell the Loaned Securities at Any Time**

67.     The Agreement stated: "Any securities of the portfolio that are on loan may be sold by the Participant's investment manager or fiduciary at any time."  In other words, the Agreement recognized that Plaintiffs had the right to manage their securities portfolios—

83217810.1                                        19

including selling securities—in a manner that would be unimpeded by their participation in the SLP.

### 7.     Wells Fargo Assumed the Risk of Loss Due to its Negligence or Fraud

68.     Section 8 of the Agreement stated that the Participants assumed the risk of loss for borrower defaults on return of loaned securities and for collateral investment losses.  However, in recognition of Wells Fargo's duties to its clients, Section 8 also stated: "The Bank expressly assumes the risk of loss arising from negligent or fraudulent operation of its Securities Lending Program."  (The Agreement for Plaintiff Nebraska Methodist is substantially similar, with a slight variation in wording.)

### C.     The Wells Fargo Trust for Securities Lending

### 1.     Wells Fargo Created a Business Trust for Securities Lending and Named Itself the Sole Trustee

69.     In October 2000—after some of the Plaintiffs had joined the SLP and executed an Agreement—Wells Fargo established the Business Trust.  Wells Fargo named itself the sole Trustee of the Business Trust.

70.     The Declaration of Trust stated that the purpose of the Business Trust was for "the investment and reinvestment of money and other property contributed thereto by participants in the securities lending program administered by the Trustee or its affiliates."

71.     In a June 1, 2001 letter to its clients announcing the formation of the Business Trust, Wells Fargo represented that the Business Trust was established "to improve efficiencies for our customers" and "improve the accounting" and that, notwithstanding the creation of the trust, "[t]he investment guidelines essentially remain unchanged."

72.     The letter attached the Confidential Memorandum for the Enhanced Yield Fund, the first of three Series (also known as pools or Funds) in the Business Trust—but not the

Declaration of Trust.   Most Plaintiffs did not receive a copy of the Declaration of Trust until 2008, after the implosion of the SLP.

73.     The Declaration of Trust stated: "This Declaration creates a trust and not a partnership."  However, Wells Fargo recognized that the Trust was a partnership and that Wells Fargo was the "general partner."

> **2.     The Business Trust and Wells Fargo as Trustee Failed to Comply With Either Maryland or Minnesota Law**

74.     Wells Fargo established the Business Trust pursuant to the Maryland Business Trust Act and filed its Certificate of Trust in October 2000.  However, for extended periods of time—including 2004 through mid-2007—Wells Fargo's Certificate of Trust was "forfeited" or "cancel[ed]" in Maryland, apparently for failure to file property tax returns.  Wells Fargo revived the Business Trust's registration in the spring of 2007.  As late as November 21, 2008, however, the Business Trust was still not in "good standing." Wells Fargo did not make all requisite filings until March  2009.

75.     The Business Trust did not conduct any business in Maryland, or own, lease, or use any personal property in Maryland.   In fact, the Wells Fargo SLP was (until recently) headquartered in Minneapolis, Minnesota.  Wells Fargo, however, never registered the Business Trust to do business in Minnesota.

76.     Wells Fargo routinely disregarded the formalities of the Business Trust.

77.     Internally, Wells Fargo identified one of the goals of the Business Trust was to "protect bank from litigation risk."  Wells Fargo did not disclose this to any of the Plaintiffs.

> **D.     Wells Fargo Created "Series," or Separate Funds, Within the Business Trust**

78.     Section 3.1(j) of the Declaration of Trust provided that the Trustee shall establish "separate and distinct Series, each with its own defined investment objectives and policies . . . ."

Ultimately, Wells Fargo established three Series in the Business Trust for the investment of collateral: the Collateral Investment for Term Loans Trust ("CI Term Trust"), the Collateral Investment Trust Fund ("CI Trust"), and the Enhanced Yield Fund ("EY Fund") (collectively, or individually, the "Series" or the "Funds").

79.     As a part of soliciting participation for these Funds, Wells Fargo provided its clients with a Subscription Agreement, a Confidential Memorandum, and an Investment Guideline and Information Statement for each Fund (although not every client was provided all materials for each Fund).

80.     While there were some differences, the governing documents for the three Series were similar in many respects and the provisions described herein were virtually identical across the three Funds.

81.     Clients who subscribed to the Funds were referred to as Shareholders or Subscribers.   As in the Declaration of Trust, ownership in each Fund was "an undivided beneficial interest."

### 1.     The Subscription Agreement

82.     Section 1 of each Subscription Agreement stated: "The Subscriber has received a copy of the Confidential Memorandum" for the particular Fund.

83.     The Subscription Agreement further stated that Subscribers may "rely[]" on, *inter alia,* the Confidential Memoranda as a source of "facts and terms."

### 2.     The Confidential Memoranda

#### a.     Wells Fargo Again Agreed to Protect the Safety and Liquidity of the Collateral Investments

84.     The Confidential Memoranda stated that "the prime considerations" for investments in each Fund "are safety of principal and daily liquidity requirements."

**b.     Wells Fargo Agreed to Value Plaintiffs' Interests in the Funds at Current Market Value**

85.     The Confidential Memoranda stated:  "The assets of the [Fund] will be valued each Business Day at their then current market value . . . ."

**c.     Wells Fargo Agreed to Redeem Plaintiffs' Interests in Cash**

86.     The Confidential Memoranda provided Subscribers with the right to redeem all or any part of their interests in the Funds in cash on seven days notice.   The Confidential Memoranda stated:

> Shareholders have the right to require the Trust to redeem all or any part of their interest in the [Fund] upon notice to Wells Fargo of at least seven (7) business days and at such other times as may be permitted by Wells Fargo, but no less often than as of the close of each Business Day, at a redemption price equal to the valuation per Share as determined by Wells Fargo.  Payment for redeemed Shares will be made in cash within seven days after the redemption date; provided, however, that Wells Fargo reserves the right to postpone payment of the redemption price (without liability for interest or income thereon) or to suspend redemption rights in certain circumstances as specified in the Declaration of Trust.

87.     The 2001 EY Fund Confidential Memorandum provided identical rights, in slightly different language.

88.     The Declaration of Trust provided for only limited postponement or suspension of redemption rights "for a period not exceeding seven days."   Wells Fargo never declared a postponement or suspension of redemption rights, even for seven days.

**d.     Wells Fargo Again Agreed to be Liable for its Wrongful Conduct**

89.     The Confidential Memoranda provided that Wells Fargo and other agents of the Trust were liable for any act or omission that involved "bad faith, willful misconduct, negligence or reckless disregard of its duties to the Trust."

### 3.      The Investment Policies for the Funds

90.      Wells Fargo published investment policies for the Funds.  These policies were contained in the Confidential Memoranda, as well as documents distributed by Wells Fargo entitled Investment Guidelines and Statement of Additional Information ("Investment Guidelines").

91.      These investment policies, to the extent relevant herein, further underscored Wells Fargo's stated commitment to invest the collateral in safe and liquid securities.

92.      For example, the Confidential Memoranda stated: "The [Fund] seeks to achieve a positive return compared to the daily Fed Funds rate by investing in high-quality, United States dollar-denominated securities where the prime considerations for the [Fund] are safety of principal and daily liquidity requirements."

93.      The Confidential Memoranda and the Investment Guidelines listed a number of specific investments that could be included in the collateral portfolio.  These included asset-backed securities and mortgage-backed securities. But these were subject to the "prime considerations" of safety and liquidity, as well as the additional parameters set forth by Wells Fargo, including the requirement that the investments meet the definition of "short term" and "high grade" money market instruments.

94.      The Confidential Memoranda defined the required liquidity in terms of not years, not months, not weeks—but "daily liquidity requirements" for the entire portfolio.

95.      The Confidential Memoranda and the Investment Guidelines further restricted investments in illiquid securities to "a maximum of 15%" of the entire portfolio of each Fund.

96.      The Confidential Memoranda also provided that all investments must be rated "in the highest short-term rating category" by one or more of the nationally recognized rating agencies (or, if unrated, be determined to be of comparable quality by Wells Fargo).

97.     It is widely acknowledged, however, that the principal U.S. rating agencies are rife with conflicts of interest—particularly in rating complex structured financial products and mortgage-backed securities—due in part, to the agencies' close relationships with the banks whose securities they rate.  Thus, Wells Fargo's due diligence responsibilities did not end with the rating agencies.  Indeed, Wells Fargo listed a favorable rating by a national agency as only one factor in what it described as a multi-faceted evaluation of the collateral portfolio.

98.     Wells Fargo also represented that its due diligence and monitoring of collateral investments would continue, even after the initial selection and purchase, as long as an investment was held in a Fund.

99.     For example, the Investment Guidelines stated that a designated person "shall review the . . . [Fund] against guidelines daily to ensure compliance, and shall report this compliance to the management on a monthly basis."

100.     And, if a security's rating or quality was downgraded, the Confidential Memoranda provide that Wells Fargo "shall reassess promptly whether such security presents minimal credit risks" and "shall . . . take such action as the Investment Manager determines is in the best interests of the [Fund] and its shareholders."

## III.     WELLS FARGO'S MULTIPLE BREACHES OF FIDUCIARY DUTY, FRAUDULENT CONDUCT, AND BREACHES OF CONTRACT

101.     As one of the largest financial institutions—and mortgage lenders—in the country, Wells Fargo has special expertise and knowledge of the risks inherent in its investment strategies. With respect to the SLP, facts relating to the collateral investments (including their associated risks and liquidity) were peculiarly within Wells Fargo's own knowledge.  Further, Wells Fargo knew that its clients, including Plaintiffs, were relying upon its representations that the collateral would be invested in money market instruments and that the "prime

considerations" would be "safety of principal and liquidity."  All Plaintiffs relied on Wells Fargo as its fiduciary in making, and monitoring, the SLP collateral investments.

102.    Yet Wells Fargo failed to undertake proper due diligence before investing (and maintaining) the cash collateral.  Moreover, Wells Fargo continued its flawed investment strategy even after it knew, or reasonably should have known, that such investments were unsafe and illiquid.  Wells Fargo concealed its wrongful conduct.  Then, Wells Fargo wrongfully violated Plaintiffs' rights to the return of their securities or redemption.

103.    In short, Wells Fargo acted in bad faith, was negligent and grossly negligent, engaged in willful misconduct and fraud, and recklessly disregarded its duties to Plaintiffs.

**A.    Wells Fargo Failed to Manage the SLP Similar to a Rule 2a-7 Money Market Fund as it Promised**

104.    Given the provisions of the governing documents—and Wells Fargo's repeated representations that it would manage the SLP similar to a Rule 2a-7 money market fund—it is not surprising that SLP participants, as well as the bank's own employees, understood that the SLP would be virtually risk free.  Wells Fargo employees stated that, "Clients, as well as some Wells Fargo team members, seem to believe that the product is a risk free investment product." A Wells Fargo executive described his conversation with the SLP Risk Manager: "She explained that most clients felt this was 'free money' without risk and I said that's the exact expression I have used."

**B.    Wells Fargo Invested in Risky Investments Contrary to its Obligations**

105.    Notwithstanding its representations and legal duties, Wells Fargo made extensive investments of the cash collateral that violated the terms and provisions found in, among other things, the Agreement, the Declaration of Trust, and the various Subscription Agreements, Confidential Memoranda, and Investment Guidelines, as well as its fiduciary duties.

106.     Wells Fargo's unsafe, illiquid, and unauthorized investments include, but are not limited to, SIVs, asset-backed securities, and mortgage-backed securities, described in more detail below.

**1.     Wells Fargo's Chairman and CEO Repeatedly Stated that the Bank Knew to Avoid Risky Investments**

107.     John Stumpf, CEO of Wells Fargo & Company and Chairman of Wells Fargo Bank, N.A., and Richard Kovacevich, Chairman of Wells Fargo & Company until 2009, stated that Wells Fargo knew in advance that the bank should avoid risky subprime investments and SIVs.

108.     For example, Messrs. Kovacevich and Stumpf wrote in the 2007 Wells Fargo annual report:

> Unlike many of our competitors, we did not participate to any significant degree in collateralized debt obligations (CDOs), structured investment vehicles (SIVs) to hold assets off our balance sheet, hedge fund financing, off-balance sheet conduits, the underwriting of low-covenant or no-covenant, large, highly leveraged loans and commitments to companies acquired by private equity firms through leverage buyouts (LBOs).

109.     With respect to subprime investments, Mr. Kovacevich stated:

> We found it very difficult to understand how you could slice and dice a subprime mortgage and come up with AAA-rated pieces . . . .  We went in and looked at this stuff . . . .  It was so toxic, as I said, we didn't even originate this stuff, let alone buy it.

110.     In fact, Mr. Kovacevich stated that Wells Fargo knew—as far back as 2005—that the bank should avoid subprime investments and SIVs:

> The head of our mortgage company . . . came to me in 2005 and said, "I don't think we should do the crazy things that are going on in the subprime mortgage market . . . ."  Similarly, Dave Hoyt, Head of Commercial Banking, decided not to pursue CDOs, CLOs, SIVs and highly leveraged loans to private equity firms, all of which became problematic in this crisis.

111.    Mr. Stumpf has repeatedly spoken out in no uncertain terms about the "enormous risks" of SIVs.  For example, in a 2008 interview, Mr. Stumpf stated:

> In fact, I was embarrassed at the time, but not so much now, that I didn't even know what an SIV was.  I thought it was some new automobile. When I finally figured it out, I thought, "Why would people do this?"  What advantage, what purpose does an SIV serve, other than putting something off balance sheet and keeping it from your investors and taking enormous risks?

112.    Similarly, Mr. Kovacevich stated in 2008: "Actually I thought an S-I-V was some new all-terrain vehicle!"

113.    Despite these statements and actual knowledge by Wells Fargo's highest officers of the risks, Wells Fargo heavily invested in these types of investments in the SLP, which was supposed to be—and was marketed as—one of the bank's safest and most conservative programs.

**2.      The SLP Heavily Invested in SIVs, Despite Wells Fargo's Knowledge of Their "Enormous Risks"**

114.    SIVs are complex investments that have been called "some of the most confusing, opaque, and illiquid debt investments ever devised."

115.    Typically, SIVs were off-shore companies created by banks and other investment firms.  SIVs borrowed money by issuing short-term securities, usually commercial paper (but also medium term notes), at low interest rates.  The SIVs then lent money by buying long-term assets at higher interest rates.  The SIVs made a profit off the spread between the two interest rates.

116.    SIVs did not file with the SEC and were not required to publicly disclose audited financial statements.  Another peculiarity of SIVs was that the sponsoring banks often kept them off their balance sheets (reminiscent of bookkeeping practices at Enron).

117.    Because SIVs borrowed short-term but invested long-term, their debt frequently became due before the underlying assets matured.  To survive, SIVs needed a constant infusion of new short-term refinancing, at favorable rates.  Often, the underlying longer-term assets of an SIV were mortgage-backed, including subprime investments.  The leverage ratio of SIVs—the ratio of liabilities to assets—was as high as 39.5 to 1.  Thus, by their very nature, SIVs were highly vulnerable and unsustainable in certain economic conditions.  As one senior Wells Fargo executive wrote in an internal email:

> The SIV business model doesn't work. SIV's [sic] will continue to fail due to a lack of liquidity—they just can't fund themselves. They can't issue new paper and so have become forced sellers— and the value of their assets decline.

118.    The Investment Guidelines for the three Series in the Business Trust did not disclose or allow SIVs as potential investments, but the SLP had an extraordinary concentration of SIVs.  The Trust Series in which Plaintiffs were most heavily invested—the CI Term—held as much as 30% of its assets in SIVs in 2007 and 2008.

119.    This percentage was so high that it violated the Investment Guidelines 25% limit for any industry or sector.  At the same time, in 2007 and 2008, the Business Trust held **no** Treasuries, which are among the most safe and liquid investments—even though "U.S. Treasury and Government sponsored Agency obligations" were the first investment type listed in the Investment Guidelines for all three Business Trust pools under "Issue Selection."

120.    Given this exposure to SIVs, there was substantial discomfort within Wells Fargo with the public comments of Wells Fargo Chairman Kovacevich and CEO Stumpf.  After Mr. Stumpf's statement about SIVs "taking enormous risks" was published, one Wells Fargo executive emailed the magazine interview to another and wrote: "Don't cringe when you read this."

121.    The first SIV in the Business Trust to go under was Cheyne, which was, in Wells Fargo's own words, run by a "hedge fund shop" based in London.

122.    The underlying assets in Cheyne (later re-named Gryphon) were primarily real estate—with more than 40% in subprime Residential Mortgage Backed Securities.

123.    By June 2007, one of the Cheyne funds reported major losses due to rising delinquencies in the mortgage market.  The Wells Fargo Rule 2a-7 money market funds—which were not part of the SLP—bailed out of Cheyne by July 2007.  The Wells Fargo SLP, however, not only failed to sell its existing Cheyne holdings in July 2007—it purchased more.

124.    In August 2007, Cheyne hit its capital-loss trigger due to a sharp decline in the value of its assets, and required the appointment of a receiver in the U.K.  SLP team members were instructed not to discuss Cheyne outside their group.

125.    After the insolvency, Wells Fargo conducted a belated due diligence—for the first time—on all of Cheyne's underlying assets.

126.    Another SIV in the SLP Business Trust was Victoria, described by Wells Fargo as an "investment arbitrage conduit."  In January 2008, Victoria became the second SIV in the SLP to default and enter enforcement.  Shortly thereafter, a senior Wells Fargo executive—outside of the SLP—evaluated the underlying assets in Victoria and concluded that "most Victoria assets have something wrong with them and that's why we have not bought them to date."

### 3.    The SLP Had Significant Exposure to Lehman Brothers, Despite Wells Fargo's Knowledge of its Impending Implosion

127.    The SLP collateral portfolio also held Lehman Brothers ("Lehman") securities with disastrous results.

128.    Wells Fargo had ample advance knowledge of Lehman's dire straights prior to Lehman's bankruptcy in September 2008.  By the September 2008 bankruptcy, many Wells

Fargo programs—except for the SLP— no longer had significant exposure to Lehman.  There were no Lehman holdings in the Wells Fargo 2a-7 money market funds and only "limited" holdings in other areas across the Wells Fargo Asset Management Group ("AMG").  The SLP, however, failed to act on Wells Fargo's knowledge of Lehman's increasing vulnerabilities.  Indeed, the day Lehman filed for bankruptcy, the SLP was the only group in the Wells Fargo AMG that was listed as "Area of Significant Risk," with $460 million in Lehman holdings.

129.    At the time of bankruptcy, each of the three SLP Business Trust Series held substantial amounts of Lehman holdings.

130.    One explanation for the SLP's outsized exposure to Lehman was their incestuous relationship.  Lehman was one of the Wells Fargo SLP's largest broker/borrowers of loaned securities: more than $1 billion each day.  In return, the Wells Fargo SLP purchased billions of dollars of Lehman securities as collateral for the program.

131.    Thus, as Wells Fargo grew increasingly concerned about Lehman over the summer of 2008, the head of the SLP was instructed that Wells Fargo was not "advertising or emphasizing" the central credit team's downgrade of Lehman.

### 4. The SLP Was Over-Exposed to Real Estate and Subprime Investments, Despite Wells Fargo's Knowledge that These Investments Were "Toxic"

132.    The SLP Business Trust had substantial and inappropriate real estate and subprime exposure—the very type of "toxic" securities that Wells Fargo Chairman Kovacevich routinely ridiculed in his public speeches.

133.    The real estate exposure of the Business Trust ranged from 10% to 30% in each of the three Trust Series at different points in 2007.  This was extraordinary, given the constraint in the Investment Guidelines that no more than 25% of each Series could be invested in any one industry.

134.    The failure of the SLP to appropriately diversify was also in direct contravention of basic portfolio management theory that requires diversification to reduce portfolio risk and avoid heavy losses if a single sector idiosyncratically performs poorly.

5.      **Wells Capital's Analysis of the SLP Confirmed the Inappropriateness of the SLP Collateral Investments**

135.    In October 2007—after the SLP "broke the buck"—senior Wells Fargo officials called in Wells Capital to evaluate the SLP portfolio.  Wells Capital ran the SLP portfolio through its portfolio credit scoring system and reported that it "is exposed to a much higher default risk than any 2a7 fund we manage."  In Wells Capital's ratings, the higher the credit score, the higher the default risk.  Wells Capital found that the SLP portfolio's credit score was "826% of the maximum credit score allowable in any 2a7 fund we manage."

136.    Wells Capital also reported that about 15% of the SLP portfolio assets "do not meet or would not meet the standards for inclusion on our [Wells Capital] approved list."  The SLP, however, repeatedly represented that all of its investments were on this approved list.

137.    Wells Capital further reported that two of the SLP pools (in which Plaintiffs participated) had "$9bln of what looks like a potentially very dangerous situation" and questioned "whether SecLending ever allocated sufficient resources to portfolio and risk management."

138.    Some Wells Fargo mutual funds participated in the SLP in separate pools outside of the Business Trust—and these funds insisted after the SLP "broke the buck" that the management of their SLP collateral investments be moved to Wells Capital.  Initial plans also called for Wells Capital to take over the investment function for the whole SLP, including the Business Trust Series that held Plaintiffs' collateral.  Wells Capital, however, expressed substantial discomfort with its ability to take on that magnitude of problems.  In the end, the

superior Wells Capital expertise and resources were used to bail out only these Wells Fargo entities outside of the Business Trust.

### C.     Wells Fargo Violated the Liquidity Guidelines

139.    The Investment Guidelines stated that a "[m]aximum of 15% of the Portfolio will be invested in illiquid securities."  This was a key constraint, given the fundamental right of SLP participants to exit the program at any time.  As the SLP Portfolio Manager recognized:  "In our business, liquidity is the name of the game . . . ."

140.    Wells Fargo, however, failed to even monitor liquidity of the SLP Business Trust in accordance with the SEC definition, which was required pursuant to the Confidential Memoranda.

141.    It is clear, however, that the SLP violated the 15% limit.  For example, the head of the SLP wrote in March 2008 that, as a percentage of assets, the EY Fund was 33% illiquid and the CI Term Trust was 77% illiquid.

142.    Because these collateral securities were illiquid, there was no current market for them.  In Wells Fargo's own words, they could only be sold at "fire-sale" or "vulture" prices. Wells Fargo's violation of the liquidity guidelines constituted breach of contract and breach of fiduciary duty, and its failure to disclose the illiquidity in the pools constituted fraudulent concealment.

### D.     Wells Fargo Failed to Take Appropriate Action as the Credit Crisis Unfolded

143.    Wells Fargo's failure to construct the SLP portfolio to withstand inevitable business cycles, its failure to take appropriate action as economic conditions changed, and its cover-up as the SLP crashed were each a significant part of the wrongdoing perpetrated by Wells Fargo upon Plaintiffs.

144.   Top bank officials were well aware of historical cycles of boom-and-bust. Chairman Kovacevich boasted that he saw the current crisis coming years out—and that the bank avoided risky investments in subprime securities and SIVs.  The reason to avoid such risk—and to harbor funds in safe investments—is to weather extreme cycles.  Yet Wells Fargo constructed a highly-vulnerable portfolio in the SLP.  Then, to compound its initial errors in loading up on these "toxic," "slice-and-dice," "enormous[ly] risk[y]" investments, Wells Fargo failed to divest these holdings—and even bought more (as with the Cheyne SIV in July 2007)—after the bank had actual knowledge of the impending credit crisis.

145.   As early as December 2006, Wells Fargo recognized deterioration in the sub-prime sector.  The reaction of the SLP was perverse.  In January 2007, instead of heeding the warning, the SLP Portfolio Manager advised: "To get bang in this econ environ – <u>take more risk</u>."  And the Wells Fargo SLP proceeded to do so.  These failures and affirmative actions constituted breach of contract and breach of fiduciary duty, and failure to disclose these actions constituted fraudulent concealment.

### 1.    The Removal of Securities from the Approved List

146.   By April 2007, the situation had deteriorated to the point where Wells Fargo began to remove investments from the approved list for the SLP due to their "sub-prime exposure/LBO [leveraged buy out] risk."  Thereafter, month after month, the removed list continued to grow, with the primary reasons for removal listed as "sub-prime exposure/CDO [collateralized debt obligations] risk."  By August 2007, nearly all SIVs were removed from the approved list.

147.   A removal for cause, *i.e.*, due to credit concerns, by Wells Capital would carry with it a "sell" recommendation.  The SLP, however, failed to sell—and held on to an increasingly vulnerable portfolio with extraordinary "sub-prime/CDO exposure."

148.    As late as February 2008, a Wells Capital executive expressed his disbelief at the failure of the SLP to sell securities that had been removed from the approved list, writing "Unbelievable.  Off the approved list, worth virtually par, and still in the portfolio."

149.    Throughout this period—and until document discovery produced pursuant to a protective order in related state-court litigation—Wells Fargo concealed information about removed securities.  Wells Fargo failed to notify SLP participants, including Plaintiffs, that any securities in the Business Trust had been removed from the approved list.

## 2.    The NAV "Breaks the Buck"

150.    By June 2007, the NAV dropped below $10 in the CI Term Trust, due primarily to the "dramatic decrease in market value" of one of the securities (SLM Corp.).  Instead of taking action to shore up the portfolio (by divesting risky, long-term, and/or subprime holdings)—and instead of notifying SLP participants—Wells Fargo's response was to increase the amount of securities on loan.    This diluted the impact of the troubled security on the entire pool—and therefore boosted the NAV—but meant loaning out additional securities belonging to the SLP participants (including many of the Plaintiffs).

151.    By no later than September 2007, the NAV of the CI Term Trust had fallen to $9.94.  In addition, the two other Trust funds were now also below par.  Wells Fargo, however, still did not notify SLP participants, including Plaintiffs, that the funds had "broken the buck" until November 2007.

## E.    "Hostage Clients" and the "Blowing Up" of the Trust

152.    By late 2007, Wells Fargo was refusing to let SLP participants recall their loaned securities and exit the program pursuant to their contractual rights.  Internally, Wells Fargo executives repeatedly referred to the situation as "Hostage Clients."  Internal documents also

show that SLP personnel were assessing the impact of Wells Fargo's policies on SLP participants: clients were described as being "F*CKED" and "screwed."

153.    Among other things, Wells Fargo changed the redemption policy to require in-kind distributions of the collateral in contradiction of the specific mandate—in the Confidential Memorandum for each of the three Trust Series—that redemptions be in cash.  Wells Fargo knew the implication of this policy change.  Participants would be locked into the program—held "hostage"—because the in-kind distribution of the SLP collateral was so devalued and/or illiquid that it could not be sold.   Internally, the SLP risk manager wrote: "in kind = cruel and unusual."

154.    Wells Fargo refused to let participants out of the program unless they paid the collateral shortfall, *i.e.*, the difference between the cost of the collateral and its value at the time that exit was requested.  Additionally, in many cases, Wells Fargo insisted on a payment for more than Wells Fargo's own calculation of the collateral losses—sometimes in amounts large enough to cover all the cost of all non-matured collateral.  For many Plaintiffs, such a payment was prohibitive.

155.    Wells Fargo further breached its duties in September 2008 when it disaggregated the Business Trust, forcing each remaining SLP participant to take an in-kind distribution of the devalued and/or illiquid collateral in a segregated account—as opposed to remaining in a pooled fund.  Wells Fargo referred to this disaggregation in internal emails as "the Big Bang" and "blowing up" the Trust.

**F.    Wells Fargo Breached its Fiduciary Duty of Impartiality by Giving "Different Deals" to Clients Who Were "More Important" to the Bank**

156.    Wells Fargo breached its fiduciary duty of impartiality by bestowing vastly different treatment on different clients, even while openly questioning the propriety of doing so.

In January 2008, top SLP management met to discuss that "Different clients are getting different deals depending on the RM [relationship manager], the circumstances, the amount of noise, and impact on overall WF relationships."  They asked:

> "Do we face further demands or litigation because of unequal treatment" and "How and when do we draw the line between the clients who are getting more and those who are not getting more?"

157.    A notable example of preferential treatment is the client—one of the largest clients in the SLP, with almost $2 billion in loaned securities—who was able to exit in September 2007 without any losses.  The client, Public Safety of Arizona, exited at $10 par, that is, without taking any losses.  The NAV, at the time, however, was below $10.  Moreover, because Public Safety of Arizona was in the commingled funds in the Business Trust—the same collateral pools as Plaintiffs—it received more than its fair share of common funds when it left the SLP, to the detriment of the other participants.

158.    The overpayment was approximately $6 million.   Initially, Wells Fargo considered making the SLP pools whole or recouping the money from Public Safety of Arizona.  Wells Fargo management, however, adopted another solution: changing the accounting methodology retroactively and backdating the books in a way that was certain to boost the NAV, thereby diminishing—on paper—the amount of the loss.

159.    Wells Fargo also made payments to certain other clients to compensate for collateral losses.

160.    Wells Fargo has confirmed that its treatment of SLP participants was intentionally unequal and depended on the client's importance to the bank.  Indeed, a senior Wells Fargo executive has testified that "some clients are maybe more important than others based on your relationship with them."

G.     **Wells Fargo Breached its Fiduciary Duties by Asserting Rights and Claims on Behalf of the Borrowing Brokers to the Detriment of Plaintiffs**

161.    Wells Fargo intentionally—and in violation of its fiduciary duty to act solely for the benefit of the Plaintiffs and not put itself in an antagonistic relationship with the Plaintiffs— took actions to benefit the borrowing brokers, to the detriment of Plaintiffs.  Examples of this conduct include, but are not limited to, Wells Fargo's failure to request that the brokers return Plaintiffs' securities and Wells Fargo's assertion of rights on behalf of the brokers by demanding that Plaintiffs pay collateral shortfalls that Wells Fargo contended were owed not to the bank, but to the brokers.

162.    Wells Fargo also has admitted that one of the primary advantages of "blowing up" the Business Trust was that it would protect the brokers from issues associated with individual clients who were exiting the program.

H.     **Wells Fargo Breached its Duty of Full Disclosure**

163.    Wells Fargo repeatedly and intentionally breached its duty of full disclosure and fraudulently concealed information by failing to disclose important information to the Plaintiffs about the status of the SLP.

164.    By way of example, Wells Fargo did not disclose to Plaintiffs that the SLP pools were below par until November 2007, although the NAV in the CI Term pool was below par as early as June 2007 and all three pools in the Business Trust were below $10 par by September 2007; Wells Fargo did not disclose that it had retroactively recalculated the NAV; Wells Fargo did not disclose that, by September 2007, 20% of the SLP collateral investments were no longer on the approved list; Wells Fargo never disclosed that the securities lending portfolio had an 826% increased risk over Wells Fargo's money market funds; Wells Fargo never disclosed that the SLP was overexposed to real estate and subprime investments and heavily invested in SIVs,

or that it failed to monitor real estate or subprime exposure or liquidity in the portfolios; and Wells Fargo failed to timely disclose that it was changing the rights of Plaintiffs to exit the program.

165.    While concealing all of the above (and more), Wells Fargo continued to send standardized monthly newsletters to SLP participants, including Plaintiffs, without disclosing the problems in the SLP.  In fact, the newsletters specifically represented in the fall of 2007 that, while credit concerns were increasing in the economy, the SLP—in accordance with how a conservative, money market fund would perform in a economic downturn—was not encountering problems.  For example, the August 2007 newsletter stated:

> In May, we noted that we could increase client earnings by simply increasing the risk profile of the reinvestment portfolio but this would run counter to both our internal policies as well as the conservative Wells Fargo credit culture. This philosophy has proven especially important this month as credit concerns surrounding sub-prime, CDS derivatives, asset-backed commercial paper, broker credit and general market credit have become more prevalent.  We have continued to take a conservative approach to investing in the money markets, an approach that has served our clients well.  The discipline that we have instilled has continued to place a priority on preservation of principal, liquidity and high quality.

166.    Similarly, the September 2007 newsletter noted "unprecedented turmoil" in the markets in general but, with respect to the SLP, stated:

> Wells Fargo has taken steps to mitigate risks in the securities lending program during this time of market volatility.
> . . .
> We have reviewed the guidelines for each portfolio and, in all cases, are investing in a considerably more conservative fashion than the investment guidelines would allow.
> . . .
> We are confident that we have purchased highly-rated high-quality fixed income instruments for the collateral portfolios and are working through any issues that the market-wide liquidity squeeze has produced.
>
> . . .

> We have benefited from the higher yields even as we have moved
> to further reduce the risk posture in our collateral portfolios from
> our usual conservative stance.

167.     The November 20, 2007 newsletter was the first notice from Wells Fargo that

there was anything amiss in the SLP.  For the first time, Wells Fargo disclosed that the Cheyne

SIV was in receivership.  Wells Fargo also disclosed—five months after the fact, and not until

page three of the newsletter—that the NAV had broken par.  The newsletter, however, continued

to conceal the most bleak information on the SLP, including, for example, that a large portion—

or, indeed, any—of the SLP investments were on the removed list and that Wells Capital had

determined the SLP portfolio's credit risk score was 826% of the maximum allowable in any of

its Rule 2a-7 money market funds.

168.     Wells Fargo's concealment continued post-November 2007 as well, as the bank

desperately needed to keep SLP participants in the program in order to keep afloat what by then

was in essence a Ponzi scheme.  Thus, the recommendation per senior management was that

participants "hold the course and not exit now."  Wells Fargo repeatedly advised Plaintiffs to

stay in the program, representing, for example, that the bank had "positioned the portfolio for

improvement in the market."

169.     But Wells Fargo continued to conceal from Plaintiffs the problems noted above or

the mounting internal concerns—and inbred web of conflicts—with Lehman.  This concealment

was intentional.

**I.      Wells Fargo Breached its Duties to Plaintiffs by Creating the Business Trust
          in an Attempt to "Extinguish" Plaintiffs' Rights**

170.     As discussed above, in October 2000, Wells Fargo created the Wells Fargo Trust

for Securities Lending.  One of the goals of the Business Trust, according to Wells Fargo's

internal documents, was to "protect bank from litigation risk."   In litigation following the 2007-

2008 crash of the SLP, Wells Fargo asserted that the Business Trust was intended to extinguish certain rights that participants had in the SLP.  Wells Fargo never informed Plaintiffs that it believed that the Declaration of Trust was intended to alter—let alone extinguish—Plaintiffs' rights.  Creation of the Business Trust in an attempt to extinguish the rights of Plaintiffs and protect the bank at Plaintiffs' expense constituted a breach of Wells Fargo's duties, and was also fraudulent.

**J.      Wells Fargo Breached Plaintiffs' Contracts by Refusing to Return Their Securities and/or Redeem Their Interests in the Securities Lending Program**

171.    Each Plaintiff engaged in discussions with Wells Fargo for many months—dating as far back as the November 2007 newsletter—in an effort to protect their investments in the SLP.

172.    During these months of discussions, Wells Fargo advised Plaintiffs to stay in the SLP—and continue to let Wells Fargo loan their securities—as the best way to mitigate any losses.  Wells Fargo reassured Plaintiffs that the collateral was merely suffering from a temporary lack of liquidity and that, over a period of months, the NAV should recover.

173.    Wells Fargo knew, or should have known, that these representations were false.

174.    When certain Plaintiffs requested that Wells Fargo return their securities, Wells Fargo rebuffed these requests, compounding the damages incurred—and further breaching those Plaintiffs' contractual rights and fiduciary duties owed to them.

**K.      Fraudulent Concealment**

175.    Wells Fargo intentionally and deliberately concealed the failing state of the SLP collateral and the fact that clients were being treated differently, among other things.  Wells Fargo failed to disclose material information in order to "avoid a run on the bank" and a "meltdown scenario" if all clients were to "run[] out the door."  Indeed, throughout 2007, Wells

Fargo continued to represent to participants that Wells Fargo was "taking a conservative approach" and investing in "a considerably more conservation fashion that the investment guidelines would allow." Wells Fargo went so far as to backdate the NAV to further the pattern of concealment.

176.    Wells Fargo also intentionally responded to direct questions—or failed to respond to direct questions—in a manner designed to divert clients from uncovering the truth of its breaches. For example, internal emails show that, in response to an inquiry regarding subprime exposure, an SLP employee stated: "I think it's a bad idea to answer these questions right now (everything we say will be held against us)." One of the SLP "simple ground rules" was: "We never admit to having problems."

## IV.    FACTS SPECIFIC TO EACH PLAINTIFF

### A.    Introduction

177.    Each Plaintiff entered into the SLP and continued to loan securities—virtually on a daily basis as many of the loans were for a single day—based on Wells Fargo's representations that the program was safe, that there was little risk, that the collateral investments would be liquid, that cash collateral from the loaned securities would be invested in short term and high grade money market instruments, that the primary considerations for Wells Fargo's investment of the collateral would be safety of principal and liquidity, and that they could recall their loaned securities for any reason at any time.

178.    After November 2007, when Wells Fargo first informed Plaintiffs that one collateral investment—the Cheyne SIV—had entered into receivership, Plaintiffs asked Wells Fargo about the status of the collateral investments and whether the Plaintiffs should continue to loan their securities and remain in the SLP.

179.   Per the terms of the governing documents, the collateral investments were supposed to be short-term (for example, to match the short-term duration of the loans of securities).   In fact, however, the collateral investments selected by Wells Fargo had various maturity dates, some short-term but others stretching out decades (to the year 2047).   If these collateral securities were liquid, Wells Fargo would have been able to sell them before their maturity dates without a loss, or "at par," and the Plaintiffs would have been able to recall their loaned securities and exit the SLP.

180.   By November 2007, however, many of the collateral securities were illiquid (and/or de-valued), and could not be sold before maturity without a loss.  In fact, Wells Fargo informed SLP participants that the illiquid securities could only be sold at fire-sale or vulture prices before their maturity dates, incurring substantial losses that Wells Fargo stated would be the responsibility of the Plaintiffs.   However, Wells Fargo generally responded to Plaintiffs after November 2007 that this was a temporary market disruption and that they should stay in the SLP, continue to let Wells Fargo loan their securities, and allow the collateral to mature at par. Wells Fargo stated that the losses were "unrealized," essentially paper losses that would not be "realized" unless the collateral securities were sold prior to maturity dates.  Wells Fargo stated that if Plaintiffs stayed the course, the unrealized losses would dissipate and there would be no (or minimal) realized losses. However, in recommending that Plaintiffs stay in the program, Wells Fargo concealed the bank's actual knowledge of the poor and unstable state of much of the collateral (including, for example, that a large portion of the collateral investments were no longer on the approved list and that Wells Capital had determined that the SLP portfolio's credit risk score was 826% of the maximum allowable in any of its Rule 2a-7 money market funds).

181.    Based on Wells Fargo's representations and concealments, all Plaintiffs continued to loan securities in the SLP for some period of time after November 2007. Contrary to Wells Fargo's representations, however, the losses increased over time, most markedly for Plaintiffs who remained in the program through September 2008, when Lehman declared bankruptcy.

182.    Over time, Wells Fargo changed the rules and/or applied the rules inconsistently in establishing how and at what price different SLP participants could recall their securities and exit the program.  For many SLP participants, the cost of exit—as established by Wells Fargo—was simply prohibitive.  These participants were trapped—held "hostage"—in the program.

183.    The first Plaintiff to exit the SLP was BCBSMN Pension Plan, which recalled all of its loaned securities and exited the SLP in March 2008.  Wells Fargo required BCBSMN Pension Plan, as a condition of recalling all of its loaned securities, to pay certain collateral shortfalls, as determined by Wells Fargo. In this manner, BCBSMN Pension Plan completely ended its participation in the SLP.

184.    Five other Plaintiffs—CentraCare, International Truck Retiree Trust, Jerome, El Paso Retirement, and the LPN Plan—continued to loan securities until August 2009, early 2011, March 2010, early 2010, and October 2010 respectively.  To recall their securities, they each paid an amount determined by Wells Fargo.  By this time, however, Wells Fargo had "blown up" the Business Trust and segregated a portion of collateral in a separate account for each remaining SLP participant.  This segregated collateral remained in each of these Plaintiff's accounts after they recalled their loaned securities.  Over time, as these collateral securities hit their maturity dates, Wells Fargo returns to these Plaintiffs a commensurate proportion of the cash that the bank had demanded for return of their loaned securities.  However, the last of the collateral does not

mature until April 2047.  Additionally, some of the collateral will never mature at par, and thus these losses will never be recouped—even if Plaintiffs wait decades.

185.    The remaining Plaintiffs continue in the SLP, but are "winding down" their participation.  As collateral matures, these Plaintiffs have been able to reduce the amount of their securities on loan.  To this day, however, Wells Fargo continues to loan their securities.  As with the Plaintiffs above, the remaining collateral has maturity dates extending for decades. Additionally, some of the collateral will never mature at par and thus certain losses will never be recouped, even with this "wind down" scenario.

### B.    BCBSMN Pension Plan

186.    BCBSMN Pension Plan and Wells Fargo executed a Securities Lending Agreement and  Subscription Agreements for the EY Fund and CI Term Trust on April 18, 2006.

187.    In 2007, as the Wells Fargo collateral investment portfolio became increasingly vulnerable and illiquid, Wells Fargo significantly increased the level of BCBSMN Pension Plan's participation in the SLP.  In April 2007, BSBCMN Pension Plan had a monthly average loan balance of $20.8 million in securities lending.  In October 2007, BSBCMN Pension Plan had a monthly average loan balance of $40.3 million.

188.    After receiving the November 2007 newsletter, BCBSMN Pension Plan inquired of Wells Fargo regarding the stability of the SLP.  Wells Fargo told BCBSMN Pension Plan that the program was safe and stable and that there was no reason to consider leaving the SLP.

189.    Nonetheless, throughout February and March 2008, several meetings were held between Wells Fargo and BCBSMN Pension Plan concerning BCBSMN Pension Plan's desire to exit the SLP.  Wells Fargo assured BCBSMN Pension Plan that there was no increased risk, and that the collateral investments—except for the two SIVs then in receivership—were sound.

Wells Fargo also told BCBSMN Pension Plan that BCBSMN Pension Plan would be responsible for any collateral losses if it exited the program.

190.    BCBSMN Pension Plan exited the SLP in April 2008 by paying, at Wells Fargo's demand, the amount of the collateral losses as calculated by Wells Fargo.

C.    **CentraCare and the Sisters Retirement Plan**

191.    Effective March 9, 2007, CentraCare and the Sisters Retirement Plan entered into a Securities Lending Agreement with Wells Fargo.

192.    CentraCare and the Sisters Retirement Plan executed the Subscription Agreements with Wells Fargo for the EY Fund and the CI Term Trust on March 12, 2007.

193.    During 2007, as the Wells Fargo collateral investment portfolio became increasingly vulnerable and illiquid, Wells Fargo significantly increased the level of CentraCare's and the Sisters Retirement Plan's participation in the SLP.  From an initial monthly average loan balance of $19.4 million in April 2007, Wells Fargo increased CentraCare's loans to over $54 million in November 2007.  The Sisters initial monthly average loan balance of $8.6 million in April 2007 increased to $32.4 million in November.

194.    For the purposes of their relationship with Wells Fargo, CentraCare and the Sisters Retirement Plan had common communications with Wells Fargo.  After receipt of the November 2007 newsletter, they had a number of communications with Wells Fargo, seeking assurances that their investments in the SLP were safe and requesting that Wells Fargo stand behind any losses in the program because of the unacceptable investment risks taken by Wells Fargo.

195.    These communications led to a meeting with Wells Fargo in February 2008 where Wells Fargo gave a PowerPoint presentation that assured that investment strategies had been made more conservative and that the troubled Cheyne and Victoria SIVs were undergoing

restructuring that would allow for payment of interest and principal.  Wells Fargo's recommendation was that "clients remain enrolled in the SLP while we work through this period of market disruption."

196.    Another meeting was held in July 2008, at which the two entities asked Wells Fargo if Wells Fargo would cover the losses and allow them to exit.  Wells Fargo responded that it would not cover losses.

197.    CentraCare and the Sisters Retirement Plan terminated the lending of their securities in August 2009, paying—as Wells Fargo demanded—an amount calculated by Wells Fargo.  However, SLP collateral that could not be sold continues to be held in an escrow account.

### D.    International Truck Retiree Trust

198.    On January 17, 2003, International Truck Retiree Trust entered into a Securities Lending Agreement with Wells Fargo.

199.    On January 17, 2003, International Truck Retiree Trust executed a Subscription Agreement with Wells Fargo for the EY Fund, and for the CI Term Trust on April 11, 2006.

200.    After Wells Fargo disclosed problems with the Cheyne SIV in late 2007, International Truck Retiree Trust began a series of ongoing outreach and communication efforts with Wells Fargo in an attempt to get answers and seek information on exiting the program.

201.    Throughout 2008, 2009, and 2010, the International Truck Retiree Trust communicated with Wells Fargo in face-to-face meetings, telephone calls, and written correspondence.  Even as the SLP losses mounted, Wells Fargo consistently predicted that the SLP investments would rebound.  Wells Fargo repeatedly urged International Truck Retiree Trust to stay in the SLP and continue to loan its securities.

202.    In early 2011, having lost patience with Wells Fargo's promises of a turnaround, and having sustained large losses, International Truck Retiree Trust terminated the lending of its

securities, paying—as Wells Fargo demanded—an amount calculated by Wells Fargo.  However, SLP collateral that could not be sold continues to be held in escrow accounts.

> ### E.  Jerome

203.  Effective March 31, 2004, Jerome and Wells Fargo entered into a Securities Lending Agreement.

204.  Jerome and Wells Fargo executed the Subscription Agreement for the EY Fund on April 2, 2004, and the Subscription Agreement for the CI Term Trust on June 26, 2006.

205.  In 2007, as the Wells Fargo collateral investment portfolio became increasingly vulnerable and illiquid, Wells Fargo significantly increased the level of Jerome's participation in the SLP.  In April 2007, Jerome had a monthly average loan balance of $16.9 million in securities lending.  In November 2007, Jerome had a monthly average loan balance of $28.5 million.

206.  In February 2008, Jerome's Investments Committee met with Wells Fargo to discuss the SLP collateral.  Wells Fargo assured the Committee that the Cheyne and Victoria SIVs were being restructured, and that total SIV exposure amounted to a very small percentage of the portfolio.  Although the Committee considered exiting the program, Jerome decided to continue to allow Wells Fargo to lend its securities based on Wells Fargo's recommendation that the collateral investments would recover.

207.  Jerome's Investment Committee met with Wells Fargo on August 23, 2008, to demand that accurate reports showing all potential losses be provided.  Certain additional reports were provided retroactively upon Jerome's demand.

208.  With the collateral portfolio continuing to decline, Jerome repeatedly informed Wells Fargo in 2008 and 2009 that it wanted to exit the program and expected Wells Fargo to make good on the losses.

209.     Wells Fargo, however, refused to take appropriate action to terminate Jerome's participation in the SLP, responding on February 9, 2009, that "it remains Wells Fargo's position that it will not indemnify securities lending participants for collateral losses."  Wells Fargo recalled no securities and failed to terminate Jerome's participation in the program.

210.     In March 2010, Jerome terminated the lending of its securities, paying—as Wells Fargo demanded—an amount calculated by Wells Fargo.  However, Wells Fargo continues to hold SLP collateral that could not be sold for Jerome in escrow an account.

**F.     Meijer Pension Trust**

211.     Effective July 20, 2006, Meijer Pension Trust and Wells Fargo entered into a Securities Lending Agreement.

212.     Meijer Pension Trust and Wells Fargo executed the Subscription Agreements for the EY Fund and CI Term Trust on July 20, 2006.

213.     In 2007, as the Wells Fargo collateral investment portfolio became increasingly vulnerable and illiquid, Wells Fargo significantly increased the level of Meijer Pension Trust's participation in the SLP.

214.     After receiving the November 2007 letter revealing the bankruptcy and subsequent downgrade of Cheyne, Meijer Pension Trust had a number of communications with Wells Fargo seeking assurances that its investments in the SLP were safe.  Wells Fargo consistently led Meijer Pension Trust to believe that over time it should expect to receive full value for Cheyne and should stay in the program because it would incur a realized loss if it exited.  For example, in March 2008, Wells Fargo advised that Meijer Pension Trust should remain in the program because "selling into the market prior to maturity is not a broad based solution since the prices remain substantially discounted from par."

215.    Losses continued to mount through 2008 and Wells Fargo continued to advise that Meijer Pension Trust stay in the program and continue to loan its securities, as a strategy for limiting its losses.  For example, in an August 2008 meeting, Wells Fargo emphasized the potential recovery of Cheyne, stating that that Meijer Pension Trust's investments were well collateralized so recovery prospects were good even if there would be some delay.

216.    At a meeting on November 24, 2008—after the Wells Fargo Business Trust had been segregated—Meijer Pension Trust asked Wells Fargo to make it whole for the losses it has incurred.  Wells Fargo responded that it had not provided any compensation to any other client and it would not compensate Meijer Pension Trust for any portion of its loss other than by temporarily waiving some fees.

217.    To this day, Wells Fargo continues to lend Meijer Pension Trust's securities.

**G.    Nebraska Methodist**

218.    Effective August 26, 1999, Nebraska Methodist and Wells Fargo (then Norwest Bank, Minnesota, N.A.) entered into a Securities Lending Agreement.

219.    Nebraska Methodist and Wells Fargo executed the Subscription Agreement for the EY Fund on July 6, 2002, and a Subscription Agreement for the CI Term Trust on April 1, 2006.

220.    After the  November 2007 newsletter disclosing the Cheyne problems, Nebraska Methodist contacted Wells Fargo about the status of the SLP.  Wells Fargo told Nebraska Methodist that it believed that these were temporary issues that would recover with time.

221.    A few months later, after troubles emerged with the Victoria SIV, Nebraska Methodist again reached out to its relationship manager at Wells Fargo.  The relationship manager came to Omaha, Nebraska, to provide a briefing and conveyed the message that Nebraska Methodist's losses, if any, would be minimal over time.  Based on those assurances,

the Nebraska Methodist Investment Committee decided to remain in the SLP and continue to loan its securities.

222.    By the fall of 2008, after the collapse of Lehman, Nebraska Methodist again expressed its concerns to Wells Fargo.  Another round of meetings ensued between Nebraska Methodist and Wells Fargo, always with assurances by Wells Fargo that the SLP was sound.  In the meantime, Nebraska Methodist's losses mounted.

223.    To this day, Wells Fargo continues to lend Nebraska Methodist's securities.

**H.    North Memorial**

224.    North Memorial first entered into a Securities Lending Agreement with Wells Fargo in September 1996, and signed a superseding Securities Lending Agreement with Wells Fargo on August 5, 2005.  Originally North Memorial participated in the SLP only on behalf of itself.  In approximately 2005, North Memorial, as administrator of the North Memorial Health Care Pension Plan, also began participating in the SLP, and Wells Fargo began lending the securities of the Health Care Pension Plan as well as those of North Memorial itself—under a single Securities Lending Agreement.  The North Memorial Health Care Pension Plan is a plan governed by ERISA.

225.    North Memorial executed a Subscription Agreement for the CI Term Trust on April 7, 2006.

226.    In late 2007, after the collapse of Cheyne, North Memorial sought advice from Wells Fargo about the stability of the SLP.  Wells Fargo maintained that the SLP setbacks were not permanent.

227.    In subsequent weeks and months, in meetings with Wells Fargo personnel, Wells Fargo told North Memorial that the value of the SLP collateral would rebound.  Meanwhile, Wells Fargo declined to stand by North Memorial's losses.

228.    To this day, Wells Fargo continues to lend North Memorial's securities.

**I.      St. John's**

229.    Effective April 15, 2005, St. John's and Wells Fargo entered into a Securities Lending Agreement.

230.    St. John's and Wells Fargo executed the Subscription Agreement for the EY Fund on April 15, 2005.

231.    In July 2008, St. John's questioned Wells Fargo regarding its expectations for ultimate losses in the SLP.  Wells Fargo responded that the "portfolio in which St. Johns participates . . . continues to perform well" and that its "analysis of the underlying Cheyne portfolio indicates a substantial principal recovery in the 82% to 92% range."  Further, Wells Fargo stated that it expected "to see ongoing improvement in the NAV and for the unrealized loss calculation to shrink. . . .  [O]ur position is that some realized loss is possible but we do not expect the ultimate realized loss to be the same as the current unrealized losses."  Wells Fargo urged St. John's to stay in the program.

232.    By September, with the bankruptcy of Lehman, St. John's losses were calculated by Wells Fargo to be more than twice what they were in July 2008.

233.    The Business Trust was then disaggregated by Wells Fargo, and on October 10, 2008, St. John's requested that Wells Fargo cease all further lending of its securities so that St. John's could exit the program.  Ultimately, however, St. John's decided that the cost of exiting the SLP—as demanded by Wells Fargo—was prohibitive.

234.    To this day, Wells Fargo continues to lend St. John's securities.

**J.      Nurses Pension Plan**

235.    Effective August 17, 2004, the Nurses Pension Plan and Wells Fargo entered into a Securities Lending Agreement.

236.    The Nurses Pension Plan and Wells Fargo executed a Subscription Agreement for the EY Fund on August 20, 2004, and a Subscription Agreement for the CI Term Trust on April 13, 2006.

237.    After the November 2007 newsletter disclosing the Cheyne problems, the Nurses Pension Plan contacted Wells Fargo about the status of the SLP.  Wells Fargo told it that Wells Fargo expected the value of the collateral to recover.  Wells Fargo recommended staying in the program, which the Nurses Pension Plan did, with the caveat that it wanted further collateral investments to be conservative—as they should have been all along.

238.    In February 2008, the Nurses Pension Plan met with Wells Fargo securities lending personnel to discuss developments of the preceding months.  Wells Fargo assured the Nurses Pension Plan that most of the collateral investments would recover their value.

239.    To this day, Wells Fargo continues to lend Nurses Pension Plan's securities.

**K.    LPN Plan**

240.    Effective August 17, 2004, the LPN Plan and Wells Fargo entered into a Securities Lending Agreement.

241.    The LPN Plan and Wells Fargo executed a Subscription Agreement for the Enhanced Yield  Series on August 20, 2004.

242.    After the November 2007 newsletter disclosing the Cheyne problems, the LPN Plan contacted Wells Fargo about the status of the SLP.  Wells Fargo told it that Wells Fargo expected the value of the collateral to recover.  Wells Fargo recommended staying in the program, which the LPN Plan did, with the caveat that it wanted further collateral investments to be conservative—as they should have been all along.

243.    In February 2008, the LPN Plan met with Wells Fargo securities lending personnel to discuss developments of the preceding months.  Wells Fargo assured the LPN Plan that most of the collateral investments would recover their value.

244.    In October 2010, the LPN Plan ended the lending of its securities by Wells Fargo, paying—as Wells Fargo demanded—an amount calculated by Wells Fargo.  Wells Fargo continues to hold SLP collateral for the LPN Plan in an escrow account.

**L.    Tuckpointers Local 52**

245.    Effective March 1, 2007, Tuckpointers Local 52 entered into two separate Securities Lending Agreements, one for each fund.

246.    Tuckpointers Local 52 and Wells Fargo executed four Subscription Agreements, one for each fund for both the CI Term Trust and Enhanced Yield Series, on March 1, 2007.

247.    After the November 2007 newsletter disclosing the Cheyne problems, Tuckpointers Local 52 contacted Wells Fargo about the status of the SLP.  Wells Fargo told Tuckpointers Local 52 that Wells Fargo expected the value of the collateral to recover.  Wells Fargo recommended staying in the program, which Tuckpointers Local 52 did, with the caveat that it wanted further collateral investments must be conservative—as they should have been all along.

248.    In February 2008, the Tuckpointers Local 52 met with Wells Fargo securities lending personnel to discuss developments of the preceding months.  Wells Fargo assured Tuckpointers Local 52 that most of the collateral investments would recover their value.

249.    To this day, Wells Fargo continues to lend Tuckpointers Local 52's securities.

**M.    El Paso Retirement**

250.    Effective January 6, 1999, El Paso Retirement and Wells Fargo (then Norwest Bank, Minnesota, N.A.) entered into an Indemnified Securities Lending Agreement.

251.    El Paso Retirement executed a subscription agreement for the CI Term Trust on April 6, 2006.

252.    After the November 2007 newsletter disclosing the Cheyne problems, El Paso Retirement contacted Wells Fargo about the status of the SLP.  Wells Fargo told El Paso Retirement that Wells Fargo expected the value of the collateral to recover.  Wells Fargo assured El Paso Retirement that the situation was only temporary and that the SLP would rebound.

253.    Throughout 2008 and into 2009, El Paso Retirement had frequent contact with Wells Fargo related to the SLP, including a series of monthly conference calls. During this time, Wells Fargo continued to maintain that El Paso Retirement should remain in the program and continue lending its securities and that El Paso Retirement would eventually recover any losses.

254.    Nevertheless, Wells Fargo refused El Paso Retirement's repeated demands that Wells Fargo stand by El Paso Retirement's losses.

255.    El Paso Retirement terminated its lending of securities in Early 2010.  Wells Fargo continues to hold SLP collateral for El Paso Retirement in an escrow account.

## CAUSES OF ACTION

### COUNT I(a)
### Breach of Fiduciary Duty – Non-ERISA

**(On Behalf of CentraCare, Sisters Retirement Plan, Jerome,
Nebraska Methodist,[1] North Memorial,[2] St. John's, and El Paso Retirement ("Non-ERISA
Plaintiffs"))**

256.    As and for this claim against Wells Fargo, the Non-ERISA Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

---

[1]  Nebraska Methodist participated in the SLP on behalf of, and as administrator of, both ERISA and non-ERISA entities under a single Securities Lending Agreement.
[2]  North Memorial participated in the SLP on behalf of, and as administrator of, both ERISA and non-ERISA entities under a single Securities Lending Agreement.

257.    Wells Fargo undertook to act as an agent and fiduciary for each Plaintiff.

258.    Wells Fargo owed each Plaintiff a fiduciary duty.

259.    The Plaintiffs placed their trust and confidence in Wells Fargo by virtue of, among other things, Wells Fargo's superior knowledge and possession and control over Plaintiffs' securities and the collateral investments in the SLP.

260.    Because Wells Fargo owed each Plaintiff a fiduciary duty, Wells Fargo was required at all times material herein to observe the utmost good faith toward all SLP participants in all of its transactions, and to invest the cash collateral in accordance with fiduciary standards of care, skill, and judgment. Further, Wells Fargo's duty of loyalty and prudence required it to disregard SLP documents or directives that it knew or reasonably should have known would lead to an imprudent result or would otherwise harm SLP participants or beneficiaries.

261.    Wells Fargo was not only obligated to ensure that all investments of securities lending cash collateral were initially consistent with the conservative investment guidelines, but was also required to continuously monitor all such investments to ensure that such investments remained prudent throughout the period of the investment.  If an investment became imprudent, Wells Fargo was obligated to take action to protect the Plaintiffs' assets.

262.    Wells Fargo was also obliged to discharge its duties solely in the interest of the Plaintiffs and for the exclusive purpose of providing benefits to Plaintiffs, and to disclose material information to Plaintiffs.

263.    Wells Fargo knew, or had reason to know, that Plaintiffs placed their trust and confidence in Wells Fargo and were relying on Wells Fargo to operate the SLP and counsel and inform them with respect to material information relating to Wells Fargo's SLP.

264.    Wells Fargo, through its officers, employees, and agents, breached the fiduciary duty it owed the Plaintiffs in numerous ways, including, without limitation, failing to fully disclose material facts, failing to invest the cash collateral in a manner consistent with its fiduciary duties, failing to appropriately monitor the collateral investments, failing to provide Plaintiffs with undivided loyalty, failing to manage the SLP with impartiality and equal consideration to all participants, and engaging in fraud.   More specifically, and without limitation, Wells Fargo breached its fiduciary duty by:

a.      Failing to invest the cash collateral in accordance with the "prime considerations" of "safety of principal and liquidity requirements";

b.      Investing in SIVs that Wells Fargo knew carried "enormous risk" and that the bank itself avoided for its own investments;

c.      Overexposing the collateral investments to real estate and subprime investments;

d.      Following plan documents or directives that would lead to an imprudent result or that would harm plan Plaintiffs;

e.      Failing to monitor the SLP collateral investments and failing to take action to protect Plaintiffs' assets when it became clear that the collateral investments were imprudent;

f.      Giving "different deals" to SLP participants who Wells Fargo considered "more important" to the bank;

g.      Giving preferential treatment to Wells Fargo entities in the SLP;

h.   Increasing the volume of securities loaned from Plaintiffs' accounts in 2007 even as market conditions deteriorated and liquidity and credit concerns increased;

i.   Failing to act to reduce exposure to the subprime and real estate sectors as it became evident that these sectors were experiencing difficulties, including increasing defaults;

j.   Failing to fully disclose material matters affecting the Plaintiffs' interests;

k.   Recommending that Plaintiffs remain in the SLP after November 2007, without disclosing, inter alia, (i) the risks of the collateral portfolio, and (ii) that other clients made substantial redemptions (some on more favorable terms than offered to Plaintiffs), exited the SLP, and/or segregated their accounts out of the pooled funds;

l.   Refusing to honor Plaintiffs' rights for the return of their securities, to redeem their interests in the SLP, and/or to terminate their participation in the SLP;

m.   Forcing Plaintiffs to take an in-kind distribution of the devalued and illiquid collateral;

n.   Asserting rights and claims on behalf of the borrowing brokers to the detriment of the Plaintiffs;

o.   Concealing its misconduct from Plaintiffs;

p.   Creating the Business Trust as a sham in an attempt to diminish Plaintiffs' rights; and

q.     Acting in bad faith, with negligence, gross negligence, willful misconduct, fraud, and/or reckless disregard of its duties.

265.     As a direct and proximate consequence of Wells Fargo's numerous breaches of fiduciary duty, the Plaintiffs suffered damages and are entitled to, among other things, recover their damages and a Court Order directing the immediate return of Plaintiffs' securities to them.

## COUNT I(b)
### Breach of Fiduciary Duty - ERISA

**(On Behalf of BCBSMN Pension Plan,
International Truck Retiree Trust, Meijer Pension Trust,
Nurses Pension Plan, Nebraska Methodist,[3] North Memorial,[4] Tuckpointers Local 52,
and LPN Plan ("ERISA Plaintiffs"))**

266.     As and for this claim against Wells Fargo, the ERISA Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

267.     The Plaintiffs bring this claim pursuant to ERISA § 404(a), 29 U.S.C § 1104(a).

268.     Wells Fargo undertook to act as an agent and fiduciary for each ERISA plan. Wells Fargo exercised discretionary authority over the investment of the Plaintiffs' plans' assets. Thus, as alleged above, Wells Fargo was a "fiduciary," within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), exercising discretionary authority or control over management of a plan or disposition of a plan's assets.

269.     The Plaintiffs placed their trust and confidence in Wells Fargo by virtue of, among other things, Wells Fargo's superior knowledge and possession and control over Plaintiffs' securities and the collateral investments in the SLP. Section 3.3 of the Declaration of Trust specifically stated that Wells Fargo was a fiduciary of a qualified employee benefit plan

---

[3] Nebraska Methodist participated in   the SLP on behalf of, and as administrator of, both ERISA and non-ERISA entities under a single Securities Lending Agreement.
[4] North Memorial participated in the SLP on behalf of, and as administrator of, both ERISA and non-ERISA entities under a single Securities Lending Agreement.

subject to the provisions of ERISA "to the extent of the investment of such assets of such plan in any Shares of the Trust."

270.    Because Wells Fargo owed each Plaintiff a fiduciary duty, Wells Fargo was required at all times material herein to observe the utmost good faith toward all SLP participants in all of its transactions, and to invest the cash collateral in accordance with fiduciary standards of care, skill, and judgment.   As a fiduciary under ERISA, Wells Fargo was responsible for ensuring that assets within the plan were prudently invested.

271.    Further, under ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), Wells Fargo's duty of loyalty and prudence required it to disregard plan documents or directives that it knew or reasonably should have known would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.   Thus, a fiduciary such as Wells Fargo could not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor could it allow others, including those whom it directs or who are directed by the plan, to do so.

272.    Under ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), Wells Fargo was not only obligated to ensure that all investments of securities lending cash collateral were initially consistent with the conservative investment guidelines, but was also required to continuously monitor all such investments to ensure that such investments remained prudent throughout the period of the investment.   If an investment became imprudent, Wells Fargo was obligated to take action to protect the ERISA Plans' assets.

273.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) provides that a fiduciary shall discharge its duties with respect to a plan solely in the interest of the participants and

beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries.

274.    ERISA also carries a duty of disclosure that Wells Fargo breached, as alleged above, by failure to disclose material information to Plaintiffs.

275.    Wells Fargo, through its officers, employees, and agents, breached the fiduciary duty it owed the Plaintiffs in numerous ways, including, without limitation, failing to fully disclose material facts, failing to invest the cash collateral in a manner consistent with its fiduciary duties, failing to appropriately monitor the collateral investments, failing to provide Plaintiffs with undivided loyalty, failing to manage the SLP with impartiality and equal consideration to all participants, and engaging in fraud.   More specifically, and without limitation, Wells Fargo breached its fiduciary duty by:

    a.    Failing to invest the cash collateral in accordance with the "prime considerations" of "safety of principal and liquidity requirements";

    b.    Investing in  SIVs that Wells Fargo knew carried "enormous risk" and that the bank itself avoided for its own investments;

    c.    Overexposing the collateral investments to real estate and subprime investments;

    d.    Following plan documents or directives that would lead to an imprudent result or that would harm plan Plaintiffs;

    e.    Failing to monitor the SLP collateral investments and failing to take action to protect the ERISA Plans assets when it became clear that the collateral investments were imprudent;

f.      Giving "different deals" to SLP participants who Wells Fargo considered "more important" to the bank;

g.      Giving preferential treatment to Wells Fargo entities in the SLP;

h.      Increasing the volume of securities loaned from Plaintiffs' accounts in 2007 even as market conditions deteriorated and liquidity and credit concerns increased;

i.      Failing to act to reduce exposure to the subprime and real estate sectors as it became evident that these sectors were experiencing difficulties, including increasing defaults;

j.      Failing to fully disclose material matters affecting the Plaintiffs' interests;

k.      Recommending that Plaintiffs remain in the SLP after November 2007, without disclosing, inter alia, (i) the risks of the collateral portfolio, and (ii) that other clients made substantial redemptions (some on more favorable terms than offered to Plaintiffs), exited the SLP, and/or segregated their accounts out of the pooled funds;

l.      Refusing to honor Plaintiffs' rights for the return of their securities, to redeem their interests in the SLP, and/or to terminate their participation in the SLP;

m.      Forcing Plaintiffs to take an in-kind distribution of the devalued and illiquid collateral;

n.      Asserting rights and claims on behalf of the borrowing brokers to the detriment of the Plaintiffs;

o.      Concealing its misconduct from Plaintiffs;

p.      Creating the Business Trust as a sham in an attempt to diminish Plaintiffs' rights; and

q.      Acting in bad faith, with negligence, gross negligence, willful misconduct, fraud, and/or reckless disregard of its duties.

276.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plaintiffs' Plans sustained substantial losses.  Pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), Wells Fargo is responsible to reimburse the Plaintiffs' Plans for all losses resulting from the breaches.  Wells Fargo is also responsible to restore to each Plaintiffs' Plan all profits that Wells Fargo has made through its use of assets of the plan, along with such other equitable or remedial relief as the Court may deem appropriate.

## COUNT II
## Breach of Contract

### (On Behalf of the Non-ERISA Plaintiffs)

277.    As and for this claim against Wells Fargo, Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

278.    Plaintiffs each have (or had, at relevant times) a contractual relationship with Wells Fargo relating to the SLP.

279.    Plaintiffs performed their obligations under the contracts.

280.    Wells Fargo materially breached its contracts with Plaintiffs in numerous ways, including, without limitation:

a.      Failing to invest the cash collateral in accordance with the "prime considerations" of "safety of principal and liquidity requirements";

b.      Failing to invest the cash collateral in "short term money market instruments";

c.    Failing to appropriately monitor the collateral investments;

d.    Failing to divest collateral investments after Wells Fargo knew, or reasonably should have known, that the investments were unsafe, risky, and/or illiquid;

e.    Failing to adhere to liquidity requirements in the investment of the cash collateral;

f.    Demanding that Plaintiffs be held responsible for the collateral losses;

g.    "Blowing up" the Business Trust and segregating the collateral investments into individual—instead of pooled—accounts;

h.    Failing to recognize Plaintiffs' rights for the return of their securities, for redemption of their interests in the SLP, and/or for terminating participation in the SLP, by, among other things:

    i.     Refusing to return certain Plaintiffs' loaned securities, and making additional loans of Plaintiffs' securities after being directed to stop lending them and/or directed to return them;

    ii.    Refusing to allow Plaintiffs to redeem for cash at the value of the NAV (on not more than seven days notice);

    iii.   Requiring Plaintiffs to pay Wells Fargo to redeem their securities;

    iv.    Refusing to terminate certain Plaintiffs' participation in the SLP on 60 days notice;

    v.     Requiring Plaintiffs to segregate a share of the collateral in the Funds before beginning a wind-down of their participation in the SLP;

vi.     Refusing to allow Plaintiffs to exit the SLP on the same terms as other participants;

vii.     Failing to calculate the NAV of the collateral investments in accordance with the Investment Company Act of 1940 and at "current market value";

viii.     Concealing its misconduct from Plaintiffs; and

ix.     Acting in bad faith, with negligence, gross negligence, willful misconduct, fraud, and/or reckless disregard of its duties.

281.    As a direct and proximate consequence of Wells Fargo's material breaches of contracts, Plaintiffs suffered damages and are entitled, among other things, to recover their damages and obtain a Court Order directing the immediate return of Plaintiffs' securities to Plaintiffs.

## COUNT III
### Intentional and Reckless Fraud and
### Fraudulent Nondisclosure/Concealment

### (On Behalf of the Non-ERISA Plaintiffs)

282.    As and for this claim against Wells Fargo, Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

283.    Wells Fargo, as alleged herein, provided false representations of material facts to Plaintiffs relating to the SLP.  These false representations were made in the standard monthly, and other, newsletters, reports, and correspondence that were provided to Plaintiffs, in the standard marketing and promotional documents (including PowerPoints) that were provided to Plaintiffs, in the SLP governing documents, and in communications that were specific to each Plaintiff but contained the same general misrepresentations that were made to other Plaintiffs.

284.    These false representations of material fact included, without limitation:

a.      "The  prime considerations for the investment portfolio shall be safety of principal and liquidity requirements";

b.      "[S]afety of principal is our paramount goal";

c.      The risks of the SLP are "minimal";

d.      Wells Fargo "[o]nly purchases fixed income or cash market securities that meet quality standards";

e.      Wells Fargo invested the cash collateral in "high-grade money market instruments";

f.      "The cash collateral is invested in high-quality fixed income and other money market-type instruments";

g.      "Only approved top tier investments";

h.      "All securities are purchased from an approved list prepared by our credit analysts;"

i.      Wells Fargo "strictly adhered to…[investment] guidelines";

j.      Wells Fargo valued the collateral investments at "current market value" and "market value";

k.      Wells Fargo valued the collateral investments as "the amount the owner of such security might reasonably expect to receive upon its current sale";

l.      Wells Fargo "purchase[d] short-term securities whose maturities approximately match the loan's expected maturity";

m.      By June 2007, Wells Fargo had not "increase[ed] the risk profile of the collateral investment portfolio";

n.   By August 2007, "the risk profile of the reinvestment portfolio" had not increased, and "preservation of principal, liquidity and high quality" remained priorities;

o.   By September 2007, Wells Fargo had "moved to further reduce the risk posture in our collateral portfolios from our usual conservative stance";

p.   By September 2007, Wells Fargo was, "in all cases . . .investing in a considerably more conservative fashion than the investment guidelines would allow";

q.   By the summer and fall of 2007, that although there was increasing illiquidity in the markets generally, this was beneficial to Wells Fargo securities lending clients because "we have benefited from higher yields" and "increased earnings from wider spreads and favorable pricing in the commercial paper markets";

r.   The collateral investments had only a "small exposure [] overall to asset-backed securities";

s.   By December 2007, "there has not been any deterioration in the [collateral] pools"; and

t.   By late December 2007, "the portfolio maintains good liquidity."

285.   Wells Fargo knew that these representations were false or made these representations as of its own knowledge without knowing whether they were true or false.

286.   Wells Fargo intended that Plaintiffs rely on these representations.

287.   Plaintiffs reasonably relied upon these representations.

288.    Wells Fargo's affirmative representations, including, without limitation, those listed above, required Wells Fargo to disclose all material facts to Plaintiffs to prevent their representations from misleading the Plaintiffs.

289.    Special circumstances also existed requiring Wells Fargo to disclose all material facts to Plaintiffs, including, without limitation, Wells Fargo's special and unique knowledge of material facts; Wells Fargo's expertise and superior knowledge of the risks inherent in their investment of the collateral; Wells Fargo's holding itself out as having expertise in securities lending, and the fact that Wells Fargo knew that Plaintiffs were relying upon its expertise and upon Wells Fargo to provide Plaintiffs with all material facts.

290.    Additionally, and as alleged herein, Wells Fargo owed Plaintiffs a fiduciary duty.

291.    Indeed, Wells Fargo knew, or had reason to know, that the Plaintiffs were placing their trust and confidence in Wells Fargo and were relying on Wells Fargo to counsel and inform the Plaintiffs.

292.    Wells Fargo intentionally and/or recklessly failed to disclose and intentionally and/or recklessly concealed material information relating to the SLP, including, without limitation, the facts that:

  a. Wells Fargo repeatedly invested the cash collateral in risky and/or illiquid securities that contravened Wells Fargo's stated investment objectives including, without limitation, preserving the safety of principal and liquidity;

  b. The investments in the collateral portfolio were deteriorating in terms of liquidity and value;

    c.      Wells Fargo calculated the NAV in a manner that was inaccurate and misleading and that artificially inflated what would be received on the underlying security's current sale;

    d.      No later than the spring of 2007, Wells Fargo noticed significant problems in the collateral investments, including weakening prices and increasing illiquidity;

    e.      A large portion of the SLP investments were on the removed list;

    f.      Wells Capital had determined the SLP portfolio's credit risk score was 826% of the maximum allowable in any of its 2a-7 money market funds:

    g.      The Cheyne Finance SIV went into receivership in September 2007 (which Wells Fargo did not disclose until two months later); and

    h.      Other securities lending clients made substantial redemptions (some on more favorable terms than allowed to Plaintiffs), exited the SLP, and/or segregated their accounts out of the pooled Business Trust and in a manner that further jeopardized Plaintiffs' interests in the pooled funds.

293.    Wells Fargo fraudulently failed to disclose the Declaration of Trust and/or Wells Fargo's interpretation of the Declaration of Trust either prior to the Plaintiffs entering into the subscription agreements or at anytime thereafter until the implosion of the trust.

294.    Wells Fargo had a duty to disclose this information in its role as the Plaintiffs' fiduciary, as well as due to the special circumstances described above.  Disclosure of such information was also necessary to correct the misleading information that Wells Fargo already provided to Plaintiffs.  Plaintiffs relied on Wells Fargo to disclose this information.

295. As a direct and proximate consequence of Wells Fargo's intentional and reckless fraud, nondisclosure, and concealment, and Plaintiffs' reliance thereon, Plaintiffs have been damaged in an amount to be determined at trial.

**COUNT IV**
**Negligent Misrepresentation**

**(On Behalf of the Non-ERISA Plaintiffs)**

296. As and for this claim against Wells Fargo, Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

297. Wells Fargo, as alleged herein, provided misrepresentations of material facts to Plaintiffs relating to the SLP, including, without limitation, those set forth in paragraphs 284, 292, and 293 above.

298. Wells Fargo owed Plaintiffs a duty of reasonable care in obtaining and communicating information to Plaintiffs regarding the SLP and made the above-described misrepresentations without due care or competence in obtaining or communicating the information.

299. Wells Fargo intended that Plaintiffs rely on these representations.

300. Plaintiffs reasonably relied upon these representations.

301. As a direct and proximate consequence of Wells Fargo's negligent misrepresentations, and Plaintiffs' reliance thereon, Plaintiffs have been damaged in an amount to be determined at trial.

**COUNT V**
**Violation of Minnesota Prevention of**
**Consumer Fraud Act—Minn. Stat. §§ 325F.69 and 8.31**

**(On Behalf of the Non-ERISA Plaintiffs)**

302.    As and for this claim against Wells Fargo, Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

303.    Wells Fargo used fraud, false pretenses, false promises, misrepresentations, misleading statements, and/or deceptive practices in connection with the sale of its SLP, including, but not limited to, selling its services and intangibles, as alleged above.  These practices in connection with the sale were ongoing as, for example, Wells Fargo lent and/or re-lent Plaintiffs' securities on a daily basis and, in conjunction therewith, bought and sold Plaintiffs' shares in The Business Trust.

304.    Wells Fargo's SLP also constituted investment contracts and it sold those contracts to Plaintiffs.

305.    Wells Fargo intended that Plaintiffs rely on those false pretenses, false promises, misrepresentations, misleading statements, or deceptive practices.

306.    By reason of the conduct alleged herein, Wells Fargo violated the provisions of Minn. Stat. § 325F.69, subd. 1.

307.    Plaintiffs have been damaged and injured by, on account of, and as a direct, proximate, and foreseeable result of Wells Fargo's violations of this statute, in an amount to be determined at trial.

308.    Wells Fargo's violations of the law – which are ongoing – have also harmed the public (and are harming the public to this day) and this litigation serves a public benefit.  For example:

a.     There is a strong public interest in preventing fraud and deceptive practices by financial institutions, as evidenced by recent crisis in the markets. Indeed, Wells Fargo's own chairman, Richard Kovacevich, has stated that financial institutions—not general economic factors—caused the current crisis and that government authorities have been ineffective in regulating financial institutions;

b.     Wells Fargo concealed its deceptive practices from regulators, including the Office of the Comptroller of the Currency ("OCC"). When the OCC conducted a review of the SLP in 2008, Wells Fargo failed to disclose the most damning information, including that the SLP had an 826 percent increased risk compared to Wells Fargo money market funds; that Wells Capital found the SLP was a very dangerous situation; that the SLP was funding long-term assets with short-term liabilities; that there were inappropriate clients in the program; and that Wells Fargo treated clients differently depending on their importance to the bank. This information was withheld despite Wells Fargo's recognition that its actions were a matter of concern to both regulators and the public;

c.     Wells Fargo's conduct directly affected a substantial number of other SLP participants who, like Plaintiffs, were shareholders in the Business Trust. There were over 100 shareholders in the Wells Fargo Business Trust. In addition to the Plaintiffs herein, and the four Plaintiffs who previously received a jury verdict on similar claims (*see WCRA, et al. v. Wells Fargo Bank, N.A.*, Minnesota Second Judicial District, 612-CV-08-10825), a

class action is currently pending in this Court and at least one other case has been settled (*see COPIC Ins. Co. v. Wells Fargo, N.A.*, D. Colo., 09-cv-00041-WDM-BNB). In addition, Wells Fargo used virtually identical—and deceptive—marketing and informational materials with other SLP potential participants;

d.    Wells Fargo advertised the SLP to the public-at-large on a Wells Fargo website. Wells Fargo represented on its website that the SLP "minimize[ed] risk"; that the SLP had "expertise in collateral management"; and that SLP clients were "earning greater revenue and consistently achieving or exceeding revenue estimates.";

e.    This litigation will shed further light on Wells Fargo's deceptive practices;

f.    Wells Fargo's wrongful conduct continues to this day. Even despite the verdict and judgment in *WCRA, et al. v. Wells Fargo Bank, N.A.*, Wells Fargo continues to refuse to return loaned securities to an untold number of SLP participants and/or make them whole for collateral losses. Efforts such as this lawsuit to compel Wells Fargo to change its behavior will benefit all SLP participants and the public-at-large;

g.    The rest of the financial community is closely watching the litigation against Wells Fargo. Holding Wells Fargo fully accountable for its unlawful conduct will serve as a deterrent effect on not only Wells Fargo but the entire financial community.

309.    By reason of Wells Fargo's violations and pursuant to Minn. Stat. § 8.31, subd. 3a, and § 325F.69, Plaintiffs demand compensatory damages, attorneys' fees and costs,

injunctive and equitable relief, and other remedies as determined by the Court pursuant to Minn. Stat. § 8.31, subd. 3a, and § 325F.68 *et seq*.

## COUNT VI
### Unlawful Trade Practices—Minn. Stat. §§ 325D.13 and 8.31

### (On Behalf of the Non-ERISA Plaintiffs)

310.    As and for this claim against Wells Fargo, Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

311.    Wells Fargo, in connection with its on-going sale of its SLP as alleged herein, knowingly misrepresented, directly and/or indirectly, the true quality of the program and the collateral investments as alleged in detail in the above counts, in violation of Minn. Stat. § 325D.13.

312.    Plaintiffs have been damaged and injured by, on account of, and as a direct, proximate, and foreseeable result of Wells Fargo's violations of this statute, in an amount to be determined at trial.

313.    Wells Fargo's violations of the law have also harmed the public and this litigation serves a public benefit, as, for example, listed in paragraph 308.

314.    By reason of such violations and pursuant to Minn. Stat. § 8.31, subd. 3a, and § 325D.13 and § 325D.15, Plaintiffs demand damages, attorneys' fees and costs, injunctive and equitable relief, and other remedies as determined by the Court pursuant to Minn. Stat. § 8.31, subd. 3a, and § 325D.09 *et seq*.

<u>COUNT VII</u>
**Deceptive Trade Practices—Minn. Stat. §§ 325D.44 AND 8.31**

**(On Behalf of the Non-ERISA Plaintiffs)**

315.    As and for this claim against Wells Fargo, Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

316.    As alleged herein, Wells Fargo represented that the services it provided to participants in the SLP and the collateral investments have, or had, characteristics, uses, and/or benefits that they do not have, in violation of Minn. Stat. § 325D.44, subd. 1(5).

317.    As alleged herein, Wells Fargo represented that the services relating to its SLP and the collateral investments are, and were, of a particular standard, quality, and/or grade that they do not possess, in violation of Minn. Stat. § 325D.44, subd. 1(7).

318.    As alleged herein, Wells Fargo advertised its services related to the SLP and the collateral investments with the intent not to sell them as advertised, in violation of Minn. Stat. § 325D.44, subd. 1(9).

319.    As alleged herein, Wells Fargo engaged in other conduct relating to the services it provided to participants in the SLP and relating to the collateral investments which similarly created a likelihood of confusion or misunderstanding, in violation of Minn. Stat. § 325D.44, subd. 1(13).

320.    Wells Fargo's violations of the law have also harmed the public and this litigation serves a public benefit, as, for example, listed in paragraph 308.

321.    Wells Fargo willfully engaged in the conduct in violation of Minn. Stat. § 325D.44 knowing it to be deceptive.

322.    Plaintiffs have been damaged and injured by, on account of, and as a direct, proximate, and foreseeable result of Wells Fargo's violations of this statute, in an amount to be determined at trial.

323.    By reason of such violations and pursuant to Minn. Stat. § 8.31, subd. 3a, and §§ 325D.44 and 325D.45, Plaintiffs demand injunctive relief, equitable relief, attorneys' fees and costs, and other remedies as determined by the Court pursuant to Minn. Stat. § 8.31, subd. 3a, and § 325D.45.

## TOLLING OF STATUTES OF LIMITATIONS

### (On Behalf of All Plaintiffs)

324.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

325.    To the extent (if any) necessary, the statutes of limitations applicable to Plaintiffs' claims herein have been tolled.

326.    Pursuant to the ruling of the United States Supreme Court in *American Pipe Construction Co. v. Utah*, 414 U.S. 538 (1974) and its progeny, the statutes of limitations applicable to Plaintiffs' claims herein have been tolled by the filing of *The City of Farmington Hills Employee Retirement System v. Wells Fargo Bank, N.A.*, CV-10-4372, a putative class action "on behalf of participants in Wells Fargo's securities lending program who were damaged thereby."

327.    The statutes of limitations applicable to Plaintiffs' claims herein have also been tolled by Wells Fargo's fraudulent concealment as alleged, without limitation, in paragraphs 101 to 176 and Count III of this Complaint, and by the discovery rule.  Plaintiffs did not learn of Wells Fargo's fraudulent concealment until well after the actions being concealed were

committed, and in most instances, not until evidence of the actions being concealed was made public during the trial of related state-court litigation in April, May, and June 2010.

328.    The statutes of limitations applicable to Plaintiffs' claims herein have also been tolled by Wells Fargo's continuing wrongful conduct.  Among other things, Wells Fargo sold its securities lending program services (and shares in the Business Trust) and conducted its wrongful activities on an ongoing basis.  In providing these ongoing services, Wells Fargo made fraudulent statements, and failed to disclose material facts, over a span of time, as detailed above. Wells Fargo's conduct is a "continuing wrong" that tolls the statute of limitations until Wells Fargo ceases its fraudulent ways.  To this day, Wells Fargo continues to loan the securities of the Plaintiffs that are still in the SLP to third-party borrowers.

## PUNITVE DAMAGES

### (On behalf of the non-ERSIA Plaintiffs)

329.    Pursuant to Minn. Stat.  §§ 549.191 and 549.20 and this Court's Order allowing amendment to assert this claim, Plaintiffs allege that the actions of Wells Fargo constitute   deliberate disregard for the rights of Plaintiffs, entitling Plaintiffs to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor that:

a.    Orders Wells Fargo to immediately return Plaintiffs' securities to Plaintiffs as required by the governing documents;

b.    Awards damages to each Plaintiff in an amount exceeding $75,000 to be determined at trial;

c.       Declares that Wells Fargo has engaged in consumer fraud, unlawful trade practices, and deceptive trade practices in violation of the laws of the state of Minnesota;

d.       Orders Wells Fargo to disgorge all profits from Plaintiffs' participation in the SLP (as an equitable remedy for breach of fiduciary duty in the case of the Non-ERISA Plaintiffs, and pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a) in the case of the ERISA Plaintiffs);

e.       Awards Plaintiffs their costs of suit and attorneys' fees pursuant to Minn. Stat. § 8.31, subd. 3a (and, in the case of the ERISA Plaintiffs, pursuant to ERISA § 502 29 U.S.C. § 1132(g)(1));

f.       Awards Plaintiffs just and proper equitable and injunctive relief;

g.       Awards the non-ERISA Plaintiffs punitive damages as a result of Wells Fargo's deliberate disregard of Plaintiffs' rights; and

h.       Includes such further relief as this Court deems just and proper.


Dated: September 11, 2012                ROBINS, KAPLAN, MILLER & CIRESI L.L.P.


                                        By:   *s/ MunirMeghjee*
                                              Michael V. Ciresi  (#16949)
                                              Vincent J. Moccio (#184640)
                                              Munir Meghjee (#301437)
                                              Stephen F. Simon (#27012X)
                                              Brock J. Specht (#388343)

                                        2800 LaSalle Plaza
                                        800 LaSalle Avenue
                                        Minneapolis, MN 55402-2015
                                        612-349-8500

                                        ATTORNEYS FOR PLAINTIFFS