UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Blue Cross and Blue Shield of Minnesota, as Administrator of the Blue Cross and Blue Shield of Minnesota Pension Equity Plan; CentraCare Health System, on Behalf of Itself and the Sisters of the Order of Saint Benedict Retirement Plan; Supplemental Benefit Committee of the International Truck and Engine Corp. Retiree Supplemental Benefit Trust, as Administrator of the International Truck and Engine Corp. Retiree Supplemental Benefit Trust; Jerome Foundation; Meijer, Inc., as Administrator of the Meijer OMP Pension Plan and Meijer Hourly Pension Plan, Participants in the Meijer Master Pension Trust; Nebraska Methodist Health System, Inc., on Behalf of Itself, and as Administrator of the Nebraska Methodist Hospital Foundation, the Nebraska Methodist Health System Retirement Account Plan, and the Jennie Edmundson Memorial Hospital Employee Retirement Plan; North Memorial Health Care; The Order of Saint Benedict, as the St. John's University Endowment and the St. John's Abbey Endowment; The Twin Cities Hospitals-Minnesota Nurses Association Pension Plan Pension Committee, as Administrator of the Twin Cities Hospitals-Minnesota Nurses Association Pension Plan, | Civil No. 11-2529 (DWF/JJG)<br><br>**MEMORANDUM<br>OPINION AND ORDER** |

     Plaintiffs,

v.

Wells Fargo Bank, N.A.,

     Defendant.

_____

Michael V. Ciresi, Esq., Munir R. Meghjee, Esq., Stephen F. Simon, Esq., Vincent J. Moccio, Esq., and Brock J. Specht, Esq., Robins Kaplan Miller & Ciresi LLP, counsel for Plaintiffs.

Lawrence T. Hofmann, Esq., Michael R. Cashman, Esq., Daniel J. Millea, Esq., James S. Reece, Esq., Lindsey A. Davis, Esq., Richard M. Hagstrom, Esq., and Rory D. Zamansky, Esq., Zelle Hofmann Voelbel & Mason LLP; Brooks F. Poley, Esq. and William A. McNab, Esq., Winthrop & Weinstine, PA,  counsel for Defendant.
_____

## INTRODUCTION

This matter is before the Court on Defendant Wells Fargo Bank, N.A.'s ("Wells Fargo") Motion for Partial Summary Judgment and to Certify Question to the Minnesota Supreme Court (Doc. No. 237), Plaintiffs' Motion for Partial Summary Judgment on Wells Fargo's Affirmative Defenses Based on the Business Trust (Doc. No. 231), and Plaintiffs' Motion to Exclude the Expert Opinions of John J. McConnell (Doc. No. 224). For the reasons set forth below, the Court denies all three motions.

## BACKGROUND

Plaintiffs are a group of institutional investors who participated in Wells Fargo's Securities Lending Program ("SLP") and suffered substantial losses during the course of their participation in the SLP.  (Doc. No. 200, Third Am. Compl. ¶¶ 11-24.)  This action stems from Wells Fargo's purported improper and imprudent investment of Plaintiffs' funds.  As such, Plaintiffs assert the following claims against Wells Fargo:  (1) Breach of Fiduciary Duty (Non-ERISA and ERISA); (2) Breach of Contract; (3) Intentional and Reckless Fraud and Fraudulent Nondisclosure/Concealment; (4) Negligent

Misrepresentation; (5) Violation of Minnesota Prevention of Consumer Fraud Act—Minn. Stat. §§ 325F.69 and 8.31; (6) Unlawful Trade Practices—Minn. Stat. §§ 325D.13 and 8.31; and (7) Deceptive Trade Practices—Minn. Stat. §§ 325D.44 and 8.31.  (Third Am. Compl. ¶¶ 256-328.)

**I.      Securities Lending Program and Business Trust**

Wells Fargo established its SLP in 1982, and its participants have included large, institutional investors with combined portfolios totaling billions of dollars.  (Doc. No. 240 ("Adams Aff. I") ¶ 9.)  As part of the SLP, Wells Fargo held the participants' securities in custodial accounts and made temporary loans of those securities to brokers. (*See, e.g.,* Doc. No. 244 ("Cashman Aff. I") ¶ 5, Exs. 1-2.)  The brokers then posted collateral, generally cash, which Wells Fargo invested until such time as the securities were returned.  (*Id.*)

Wells Fargo entered into Securities Lending Agreements ("SLAs") and other contractual agreements with each of the participants whereby Wells Fargo agreed to act as the participants' agent and agreed to follow certain restrictions with respect to its investment of the cash collateral.  (Doc. No. 250 ("Moccio Aff. II") ¶ 3, Exs. 7-18.)  In particular, the SLAs stated that "[t]he prime considerations for the investment portfolio shall be safety of principal and liquidity requirements."  (*Id.*)  The Confidential Memoranda and Investment Guidelines distributed to Plaintiffs also include similarly worded investment objectives regarding safety of principal and daily liquidity requirements.  (Cashman Aff. I ¶ 5, Ex. 60, 62, 63.)

On October 24, 2000, Wells Fargo formed a Business Trust pursuant to the Maryland Business Trust Act "for the investment and reinvestment of money" in connection with the SLP.  (Cashman Aff. I ¶ 5, Ex. 61.)  Three Trust Series were developed after the creation of the Trust, including the two at issue here:  the Enhanced Yield Fund ("EYF") and the Collateral Investment for Term Loans Trust ("CI Term").  On June 1, 2001, Wells Fargo sent notice to its SLP participants that it was "establishing a business trust format" that would "function as an unregistered mutual fund" in order to "contribute to better returns for [Wells Fargo's] clients by increasing the effectiveness of [Wells Fargo's] daily process." (*See, e.g.,* Moccio Aff. II ¶ 3, Ex. 20.)  According to Wells Fargo, investors participating in the SLP at the time were given 30 days to opt out of the Business Trust.  (Doc. No. 261, Hruska-Claeys Aff. ¶ 23.)  Thereafter, several Plaintiffs signed Subscription Agreements with respect to a particular Trust Series, whereby they consented to be bound by the terms of the Declaration of Trust.[1]  (Cashman Aff. I ¶ 5, Exs. 16-38.)

The Declaration of Trust states in part:

Section 8.1 Limitation of Liability. All persons contracting with or having any claim against the Trust or a particular Series shall look only to the assets of the Trust or such Series, respectively, for payment under such contract or claim; and neither the Trustee nor any of the Trust's officers, employees or agents, whether past, present or future (each a "Covered

---

[1]  Those Plaintiffs that were participating in the program in 2001, however, claim that they did not receive a copy of the Declaration of Trust when the notification was mailed.  (*See* Moccio Aff. II ¶ 3, Exs. 20-23.)  Furthermore, Plaintiffs allege that some of them were entered into a Trust Series without signing a Subscription Agreement.  (*See* Moccio Aff. II ¶ 3, Ex. 32.)

4

>Person" and collectively the "Covered Persons"), shall be personally liable therefor. No Covered Person shall be liable to the Trust or to any Shareholder for any loss, damage, or claim incurred by reason of any act performed or omitted by such Covered Person in good faith on behalf of the Trust, or a Series thereof, and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Declaration, except that a Covered Person shall be liable for any loss, damage or claim incurred by reason of such Covered Person's bad faith, gross negligence, willful misconduct or reckless disregard of the duties involved in the conduct of his or her office.
>
>. . .
>
>Section 8.4 Contractual Modification of Duties. To the extent that, at law or equity, a Covered Person has duties (including fiduciary duties) and liabilities relating to the Trust or any Series thereof or to any Shareholder, any such Covered Person acting under this Declaration shall not be liable to the Trust or any Series or to any Shareholder for the Covered Person's good faith reliance on the provisions of this Declaration. The provisions of this Declaration, to the extent that they restrict or limit the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Covered Person.

(Cashman Aff. I ¶ 5, Ex. 61 §§ 8.1, 8.4.)

The Trust subsequently began investing on July 1, 2001. (*Id.* ¶ 26.) At all relevant times, the SLP's business was conducted through Wells Fargo, as trustee. (*See* Moccio Aff. II ¶ 3, Ex. 54 at 29.) The Trust was subject to a number of investment guidelines established by Wells Fargo, as well as guidelines that were specific to each Series. (Cashman Aff. I ¶ 5, Exs. 62-63.) The Trust invested strictly in fixed income securities, whose interest rates changed throughout the investment period. (Adams Aff. I ¶¶ 80-81.) Those securities could be purchased from corporations, investment banks, or structured investment vehicles ("SIVs"). (Adams Aff. I ¶ 57; Cashman Aff. I ¶ 5, Exs.

62-63.) Up to 30% of all assets were held in SIVs in 2007 and 2008, and were largely backed by real estate. (Moccio Aff. II ¶ 3, Ex. 36 at 74.) A substantial number of the securities in the Trust were issued by three entities: Cheyne Finance LLC ("Cheyne"), Stanfield Victoria Ltd. ("Stanfield Victoria"), and Lehman Brothers Holdings, Inc. ("Lehman Brothers"), all of which defaulted in the 2007 credit crisis. (*See* Cashman Aff. I ¶ 5, Exs. 71-82.)

Cheyne assets were predominantly real estate holdings, with 42% in subprime mortgage-backed securities. (Moccio Aff. II ¶ 3, Ex. 52 at 91.) Although Cheyne went into receivership on September 5, 2007, the Trust Committee chose to keep all Cheyne securities, as two bidders were considering a purchase of Cheyne, which would have increased value in the securities. (Cashman Aff. I ¶ 5, Exs. 72-73.) The potential purchasers ultimately withdrew their bids, and Cheyne experienced "an enforcement event" on October 17, 2007, at which time Cheyne securities became unsaleable. (Adams Aff. I ¶¶ 107-09.) Plaintiffs were notified of this loss on November 20, 2007. (Cashman Aff. I ¶ 5, Ex. 74.)

In turn, due to the credit freeze, there were few purchasers for short-term fixed income notes, such as those provided by Stanfield Victoria, which subsequently defaulted on January 10, 2008. (Adams Aff. I ¶ 116.) Prior to the default, a Wells Fargo executive evaluated the Stanfield Victoria assets and found a "possibility for a horrible scenario." (Moccio Aff. II ¶ 3, Ex. 57.) Still, the SLP continued to hold Cheyne and Stanfield Victoria securities through at least the summer of 2008. (Moccio Aff. II ¶ 3, Exs. 54, 58.)

Wells Fargo contends that, in light of these two defaults, it monitored Lehman Brothers throughout 2007 and 2008, but believed that the government's assistance of Bear Stearns indicated that Lehman Brothers faced a low risk of default. (Cashman Aff. I ¶ 5, Exs. 80-82; Adams Aff. I ¶ 120.) Plaintiffs, however, argue that internal memoranda suggest that Wells Fargo anticipated the collapse of Lehman Brothers, concealed the information from Plaintiffs, and chose to favor certain clients to Plaintiffs' detriment. (Moccio Aff. II ¶ 3, Exs. 59-64.) They also allege that the EYF and CI Term Series' net asset value began declining in early 2007, which should have suggested a serious problem in the investment, and which Wells Fargo did not disclose to Plaintiffs. (Moccio Aff. II ¶ 3, Ex. 87 at 31 & Ex. 88 at 17.) Furthermore, as late as October 2007, Wells Fargo was letting preferred clients exit the SLP "at the same price they got in," regardless of fair market value of the assets, ultimately increasing the losses Plaintiffs incurred. (Moccio Aff. II ¶ 3, Ex. 102.) In March 2008, Wells Fargo ultimately changed the SLP exit policy to "Distribution in Kind," or a pro-rata distribution of the illiquid securities. (Moccio Aff. II ¶ 3, Exs. 112-13.)

On September 15, 2008, Lehman Brothers declared bankruptcy. (Moccio Aff. II ¶ 3, Exs. 83-84; Adams Aff. I ¶¶ 125-28.) Following Lehman Brothers' collapse, the Committee opted to disaggregate the remaining Trust assets on September 19, 2008. (Cashman Aff. I ¶ 5, Ex. 68; *see* Doc. No. 242, Ahlstrand Aff. ¶ 24.) Ultimately, the Trust was drained of all assets, and Plaintiffs have been unable to resell their portion of the assets to an appreciable value. (Moccio Aff. II ¶ 3, Ex. 24 at 1734, 2262.) Six of the

Plaintiffs are still participating in the SLP, as Wells Fargo requires that they each pay the collateral shortfall on their accounts in order to exit.  (Moccio Aff. II ¶ 3, Ex. 131.)

## II.     McConnell's Expert Opinions

Plaintiffs have also moved to preclude the testimony and opinions of Wells Fargo's expert, Professor John H. McConnell ("McConnell").  (Doc. No. 224.) McConnell is an economist and professor at Purdue University, and has submitted an expert report in the course of this litigation.  (Doc. No. 254, McConnell Aff. ¶¶ 1-2.) McConnell's report offers his opinions as "to what extent, if any, Plaintiffs suffered losses as a result of their participation in the Wells Fargo Securities Lending Program." (Doc. No. 227, Moccio Aff. I ¶ 3, Ex. 1 ("McConnell Report") ¶ 2.)

McConnell's methodology includes a three-stage approach to calculate the losses Plaintiffs suffered by comparing their actual losses to those of a hypothetical investment pool in the same position as the SLP during the 2007 credit crisis.  (*See* McConnell Report ¶¶ 49-50.)  The first step of McConnell's analysis is to calculate each Plaintiff's "shortfall" resulting from its participation in the SLP.  (*Id*. ¶¶ 51-57.)  In other words, the shortfall is the amount a Plaintiff owed to its borrowers as of September 30, 2012, minus the market value of the securities held by that Plaintiff on the same date.  (*Id.*)  Second, McConnell calculates the "net shortfall":  each Plaintiff's "respective shortfalls less securities lending earnings received . . . over the time period of June 30, 2007 through September 30, 2012."  (*Id*. ¶ 59.)  Finally, McConnell compares this net shortfall to that of an alternative, hypothetical benchmark SLP, and asserts that the difference between

the two numbers is each Plaintiff's economic loss.  (*Id*. ¶¶ 64, 85-86.)  In constructing the hypothetical portfolio, McConnell uses data from the Risk Management Association, which compiles data from 15-20 securities lending intermediaries, including asset class composition, size, and total interest paid from different securities.  (*Id*. ¶¶ 69-80.)  At their core, McConnell's calculations stem from his position that, "[f]rom an economic perspective, Plaintiffs' losses must be measured relative to an appropriate benchmark," thus requiring a comparison of Plaintiffs' actual losses to the outcome that Plaintiffs would have experienced had they participated in an alternative, hypothetical securities lending program.  (*Id.* ¶¶ 6-7.)

## DISCUSSION

I.   **Summary Judgment Motions**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

### A. Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs move for summary judgment with respect to those of Wells Fargo's affirmative defenses that seek to limit its liability based on the Declaration of Trust. Specifically, Plaintiffs seek judgment on affirmative defenses 18, 19 and 25.[2] (*See* Doc. No. 207.)

---

[2] The relevant affirmative defenses state the following:
    18. Plaintiffs' claims are barred by the business judgment rule. Any alleged liability of Wells Fargo is limited by the Declaration of Trust.
    19. Any liability under Plaintiffs' claims is limited by the Md. Corps. and Assns. Code §§ 12-401 et seq. and by the agreements of the parties, including the Declaration of Trust for the Wells Fargo Trust for Securities Lending.
    . . .
    25. Plaintiffs' breach of fiduciary duty claim is preempted by their breach of contract claim because the parties' contracts define the scope of any duties owed by Wells Fargo.
(Doc. No. 207 at 57.)

Having considered the relevant provisions of the Declaration of Trust, as well as the entire record, the Court finds that the Declaration of Trust does not unambiguously eliminate all of Wells Fargo's non-contractual duties to Plaintiffs. *See COPIC Ins. Co. v. Wells Fargo Bank, N.A.*, 767 F. Supp. 2d 1191, 1205-08 (D. Colo. 2011) (finding issues of fact regarding the applicable standard of negligence and determining that Section 8.4 "does not unambiguously eliminate all non-contractual duties"). Questions of fact exist as to whether Wells Fargo's investment of collateral in risky securities "could fall under the exclusion of liability for an act performed by a covered person in a manner reasonably believed to be within the scope of authority conferred by the Declaration." *Workers Comp. Reins. Assoc. v. Wells Fargo Bank, N.A. ("WCRA")*, 2012 WL 1253094, at *7 (Minn. Ct. App. Apr. 16, 2012), quoting *COPIC*, 767 F. Supp. 2d. at 1207. Considering the relevant documents together, including the Declaration of Trust, the SLAs, Subscription Agreements, and Confidential Memoranda, the relevant standard of care is ambiguous and should be resolved by a fact-finder at trial. *See COPIC*, 767 F. Supp. 2d at 1207 (finding conflict between the "gross negligence" standard of the Declaration and the simple negligence standard of the SLA and determining that "[r]esolution of the interplay among these various provisions, and whether any should be given primacy, should be done by a fact-finder.").

The Court finds that Plaintiffs have neither demonstrated that Wells Fargo's affirmative defenses fail as a matter of law, nor the absence of any genuine issue of material fact sufficient to warrant summary judgment. While the Court acknowledges

that Wells Fargo faces a high hurdle to establish that its conduct falls within any exclusion of liability provision contained within the Declaration of Trust, it will be for the jury to decide Wells Fargo's liability, or lack thereof, based on the evidence presented at trial. The Court further notes that other courts and juries that have examined this issue have consistently found that the Declaration of Trust did not eliminate or modify Wells Fargo's fiduciary duties to its investors.[3] *See, e.g. WCRA*, 2012 WL 1253094, at *7. To the extent Plaintiffs further contend that the Business Trust should be disregarded as a "sham entity," such an argument clearly presents questions of fact for the jury.

### B. Wells Fargo's Motion for Partial Summary Judgment

Wells Fargo moves for partial summary judgment on the ERISA fiduciary duty claim (Count I(b)), as well as the non-ERISA Minnesota Consumer Fraud Act ("MCFA") claim (Count V), Deceptive Trade Practices Act ("DTPA") claim (Count VI), and Unlawful Trade Practices Act ("UTPA") claim (Count VII).

#### 1. ERISA Fiduciary Duty Claims

Plaintiffs assert an ERISA breach of fiduciary duty claim in Count I(b). ERISA imposes a duty of loyalty, a duty of prudence, and a duty to diversify plan investments upon fiduciaries. *See* 29 U.S.C. § 1104(a)(1). Wells Fargo claims that it complied with the Trust's investment guidelines and did not act imprudently, thus warranting summary judgment in its favor.

---

[3] The Court acknowledges that it may need to address the proper scope of opening statements and other evidentiary issues at the pretrial hearing in this matter.

Plaintiffs have submitted evidence that could lead a reasonable fact-finder to conclude that Wells Fargo failed to prudently and conservatively invest the SLP collateral, that Wells Fargo abused its discretion as trustee, and that Wells Fargo failed to comply with its own investment guidelines.  Plaintiffs have also raised issues of fact with respect to Wells Fargo's alleged differential treatment of investors regarding their exit options, and Wells Fargo's purported failure to disclose material information to Plaintiffs pertaining to their investments.

The Court finds that genuine issues of material fact exist as to whether a breach of fiduciary duty occurred, and whether the loss to Plaintiffs was the result of such a breach. *See Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917 (8th Cir. 1994).  As such, summary judgment on the ERISA fiduciary duty claim is not proper.

### 2. Non-ERISA MCFA, DTPA, and UTPA Claims

Count V asserts a claim under the MCFA.  Defendants claim that the non-ERISA Plaintiffs' MCFA claim must fail because this case serves no public benefit.  With respect to Count V, Wells Fargo asks the Court to certify the following question to the Minnesota Supreme Court:  "Under Minnesota Statutes §§ 325F.69, 325D.13, 325D.44 and 8.31, does the public benefit previously served by the Private AG claim in the *WCRA* Litigation preclude Plaintiff's current Private AG claims when no further public benefit can be demonstrated?"  (Doc. No. 239.)  In response, Plaintiffs contend that this question has already been answered in their favor by the Minnesota Court of Appeals in *WCRA*.

The Court addressed the public benefit issue in great detail in its order on Wells Fargo's motion to dismiss. (*See* Doc. No. 94 at 12-17.) The public benefit requirement is not onerous. *Kinetic Co.*, 672 F. Supp. 933, 946 (D. Minn. 2009). As was the case at the time of the motion to dismiss, Wells Fargo is still engaged in securities lending for some Plaintiffs that have not exited the SLP, and Plaintiffs seek an injunction for return of those securities. Thus, there appears to be an issue of fact with respect to any ongoing or future harm. Wells Fargo has not demonstrated the absence of genuine issues of material fact on the MCFA claim. The Court declines to certify the question.

Wells Fargo contends that the DTPA and UTPA claims also fail on similar grounds. To the extent Defendant argues that those claims do not serve a public benefit, the Court finds this argument unpersuasive for the reasons discussed above. Defendant further argues that the Private AG statute does not provide a private remedy for purported violations of the DTPA and that Plaintiffs have failed to demonstrate any likelihood of future harm. The Court concludes that Plaintiffs have demonstrated, at a minimum, genuine issues of material fact with respect to ongoing or future harm and entitlement to injunctive relief. *See* Minn. Stat. § 325D.45, subd. 1.

In light of the foregoing, Wells Fargo's motion for partial summary judgment is properly denied in all respects.

## II. Motion to Exclude McConnell's Opinions

Plaintiffs also move to exclude the testimony and opinions of Wells Fargo's expert, Professor John J. McConnell. Plaintiffs contend that McConnell's methodology

and conclusions are "speculative, against settled law, and devoid of necessary evidentiary support." (Doc. No. 224.) Plaintiffs take issue with McConnell's hypothetical SLP and contend that McConnell's SLP contains the very types of investments that Plaintiffs allege were improper in the Wells Fargo SLP; Plaintiffs thus claim that the hypothetical SLP does not rise to the level of a prudent investor.

Plaintiffs seek to exclude McConnell's testimony pursuant to Rule 702 of the Federal Rules of Evidence and the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993). Before accepting the testimony of an expert witness, the trial court is charged with a "gatekeeper" function of determining whether an opinion is based upon sound, reliable theory, or whether it constitutes rank speculation. *Daubert*, 509 U.S. at 589–90. In *Daubert,* the United States Supreme Court imposed an obligation upon trial court judges to ensure that scientific testimony is not only relevant, but also reliable under the Rules of Evidence. *Id.* at 579.

The proposed expert testimony must meet three prerequisites to be admissible under Federal Rule of Evidence 702. *Lauzon v. Senco Prods., Inc.,* 270 F.3d 681, 686 (8th Cir. 2001). "First, evidence based on scientific, technical or other specialized knowledge must be useful to the fact-finder in deciding the ultimate issue of fact." *Id.* "[I]t is the responsibility of the trial judge to determine whether a particular expert has sufficient specialized knowledge to assist jurors in deciding the specific issues in the case." *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.,* 254 F.3d 706, 715 (8th Cir. 2001). Second, the proposed expert must be qualified. *Id.* Third, the

proposed evidence must be reliable. *Id.* The proponent of the expert testimony bears the burden to prove its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10.

In determining whether the proposed expert testimony is reliable, the Court can consider: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known rate of potential error; and (4) whether the theory has been generally accepted. *Id.* at 593–94. The purpose of these requirements "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999).

In *Kuhmo Tire,* the Supreme Court determined, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* In other words, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony. *Id.* The objective of that requirement is to ensure the reliability and relevancy of expert testimony. *Id.*

The Court's focus should be on whether the testimony is grounded upon scientifically valid reasoning or methodology. *United States v. Dico, Inc.,* 266 F.3d 864, 869 (8th Cir. 2001). "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to

examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Bonner v. ISP Techs., Inc.,* 259 F.3d 924, 929–30 (8th Cir. 2001).

Having considered the relevant factors, the Court finds that Wells Fargo has demonstrated that McConnell's opinions are sufficiently reliable to meet the threshold of admissibility. While the Court questions the ultimate impact of McConnell's findings, in light of the entire record, the Court cannot conclude that McConnell's opinions are so fundamentally unsupported that they can offer no assistance to the jury; the Court thus declines to exclude his testimony.

Central to Plaintiffs' motion is Plaintiffs' dispute of the investments selected by McConnell for his hypothetical benchmark comparison analysis; Plaintiffs claim that the investments included in that benchmark do not rise to the requisite "prudent" investor standard. In this manner, Plaintiffs also challenge the reliability of McConnell's calculations and opinions. Whether McConnell's benchmark portfolio selections are "prudent" investments, however, is itself a question of fact for the jury. At their core, Plaintiffs' challenges appear to go to the weight of McConnell's testimony, not its admissibility.

As such, Plaintiffs may test the credibility of McConnell's opinions—and methodology—on cross examination, rebut the testimony with its own witnesses, and submit its own contrary expert evidence; the jury can thus determine the credibility of,

and weight to be given to, McConnell's testimony. *See, e.g., Rockwood Retaining Walls, Inc. v. Patterson, Thuente, Skaar & Christensen, P.A.,* Civ. No. 09-2493, 2011 WL 2845529, at *5 (D. Minn. July 18, 2011). Here, the Court resolves any doubts regarding the overall value of McConnell's testimony in favor of its admissibility. *See Clark by Clark v. Hendrick*, 150 F.3d 912, 915 (8th Cir. 1998) (noting that "doubts regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility"). Of course, the admissibility of McConnell's testimony will be subject to the proper foundation being laid, especially as it relates to the hypothetical benchmark SLP. Therefore, Plaintiffs' *Daubert* motion is denied.

## ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' Motion for Partial Summary Judgment on Wells Fargo's Affirmative Defenses Based on the Business Trust (Doc. No. [231]) is **DENIED**.

2. Wells Fargo Bank, N.A.'s Motion for Partial Summary Judgment and to Certify Question to Minnesota Supreme Court (Doc. No. [237]) is **DENIED**.

3. Plaintiffs' Motion to Exclude the Expert Opinions of John J. McConnell (Doc. No. [224]) is **DENIED**.

Dated: June 4, 2013
               s/Donovan W. Frank
               DONOVAN W. FRANK
               United States District Judge